**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| Kenneth J. Lecky, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> Virginia State Board of Elections, *et al.* <br><br> Defendants. | Civil Action No. 1:17-cv-01336 <br><br> Judge T.S. Ellis, III |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

## I. INTRODUCTION

On November 27, 2017, the Virginia Board of Elections certified that Robert M. "Bob" Thomas, Jr., received 82 more votes in the General Election to represent House District 28 in the Virginia House of Delegates ("House of Delegates"). At the same time, the Board reported that 384 voters were assigned to the incorrect districts. Of those, 147 voted in the general election and therefore—through no fault of their own—did not vote in their proper House of Delegates race. Of the mis-assigned 147 voters, 86 voters who should have voted in House District 28 were given ballots for another district, while 61 voters who should have received ballots for another district instead received House District 28 ballots. In other words, the number of votes unlawfully cast or excluded exceeds Thomas's margin of victory.

Accordingly, plaintiffs Kenneth J. Lecky, Dolores ("D.D.") Lecky, Phillip ("Phil") Ridderhof, and Amy Ridderhof ("Plaintiffs") move the Court pursuant to Rule 65 to preliminarily enjoin Defendants from seating Bob Thomas, Jr., in the Virginia House of

Delegates as the duly elected delegate for House District ("HD") 28 and enter an injunction requiring a new election.

## II. STATEMENT OF FACTS

The facts of this case are set forth in more detail in the amended complaint (ECF No. 35) and the declarations submitted contemporaneously with this memorandum. To summarize:

Based on a detailed analysis of the Virginia Department of Elections (the "Department"), 384 registered voters were erroneously assigned or not assigned to vote in the House District 28 election. (Cortés Decl. ¶¶ 7-11 & Ex. A.) Of these voters, 147 voted in the General Election. (Cortés Decl. ¶ 10 & Ex. A.) Eighty-six (86) of these 147 voters, including Kenneth Lecky (K. Lecky Decl. ¶¶ 3-10) and D.D. Lecky (D. Lecky Decl. ¶¶ 3-17), were residents of House District 28 but were misassigned to House District 2 or House District 88. (Cortés Decl. ¶ 10 & Ex. A.) Those voters were given -- and voted -- ballots for the incorrect House of Delegates election. (*Id.*; K. Lecky Decl. ¶¶ 10-11; D. Lecky Decl. ¶ 11.) In addition, a poll worker gave at least one other resident of House District 28, plaintiff Phil Ridderhof -- and likely many more -- a ballot for House District 88 despite being listed in the poll book as House District 28 voters. (P. Ridderhof Decl. ¶ 9-12; A. Ridderhof Decl. ¶ 12.) Defendants' actions thereby resulted in at least 87 House District 28 residents casting ballots in the elections of other house districts and being improperly denied the right to vote in the election of their own representative.

In addition, as a result of misassignment by Defendants, 61 residents of House District 88 voted in the House District 28 election. (Cortés Decl. ¶ 11.) These illegal votes diluted the legal votes of House District 28 residents, including plaintiff Amy Ridderhof (A. Ridderhof Decl. ¶¶ 4-12).

Most troubling, Defendants knew of these serious problems with the administration of the election no later than 11 a.m. on Election Day and still have taken no steps to remedy the

resulting disenfranchisement. (Cortés Decl. ¶ 6.)

In total, 147 votes have been counted or excluded from the House District 28 election due to Defendants' conduct. The candidates are separated by 82 votes. (Cortés Decl. ¶ 11.) As detailed below, the Board of Elections certified this vote tabulation while acknowledging that the 147 votes exceeded the margin separating the two candidates because "the Department [of Elections] has no mechanism to provide a remedy to these voters." (Cortés Decl. ¶ 12.)

### III. PROCEDURAL HISTORY

On November 21, 2017, plaintiffs Kenneth Lecky, D.D. Lecky, and Phil Ridderhof filed a complaint alleging that their rights under the First and Fourteenth Amendments were violated when election officials denied them the right to vote in the general election for House District 28. (ECF No. 1.) At the same time, plaintiffs moved for a temporary restraining order and preliminary injunction to enjoin the Virginia Board of the Elections from certifying the results of the election. (ECF No. 2.) The Court promptly scheduled a hearing on plaintiffs' motion for November 22 (ECF No. 24), and the Court denied the motion for a temporary restraining order at the conclusion of that hearing (ECF No. 26).

On November 27, the Board of Elections unanimously certified election returns showing that Thomas received 82 more votes than Cole. (Cortés Decl. ¶ 11.) The Board also voted unanimously to append to the certification a report of Commissioner Cortés regarding the HD-28 election that stated include 61 ballots voted by voters who did not reside in HD-28. (*Id.*) The report further stated that 86 HD-28 voters were listed in the election administrators records as residing in other House districts, and therefore were given a ballot that did not include the HD-28 election. (*Id.*)

In light of the Board's certification, the Court ordered plaintiffs to show cause "why this case should not now be dismissed as moot," noting "that the only remedy request in the

- 3 -

complaint is an injunction barring the certification of election results that have now been certified . . . ." (ECF No. 31.). Plaintiffs responded today that they intended to file an amended complaint, alleging additional facts, naming additional defendants, and seeking new relief, including an order sufficient to require the Board of Elections to withdraw its certification, to prohibit Thomas from becoming a member of the House of Delegates on the basis of the results of the 2017 General Election; and to require a writ of election be issued to hold a special election for District 28 of the House of Delegates. (ECF No. 34.) Plaintiffs subsequently filed their amended complaint (ECF No. 35) and this motion for preliminary injunction seeking that relief.

## IV.  STANDARD

"To win . . . a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina ("LOWV")*, 769 F.3d 224, 236 (4th Cir. 2014); *see also Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) ("A plaintiff seeking a preliminary injunction must demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'") (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Courts considering whether to impose preliminary injunctions must separately consider each [of these four] factor[s]." *Di Biase*, 872 F.3d at 230.

## V.  ARGUMENT

**A.  Plaintiffs are Likely to Prevail on the Merits of Their Claims.**

Plaintiffs have "ma[de] a clear showing that [they are] likely to succeed at trial." *Id.* at 230; *see also id.* (noting that "[a] plaintiff need not establish a 'certainty of success'" (quoting *Pashby v. Delia,* 709 F.3d 307 (4th Cir. 2013)). The U.S. Constitution's protection of Plaintiffs'

fundamental right to vote requires that voters not be disenfranchised by state action. "It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (internal citation omitted). That right "can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing." *Id.* at 554-55 (internal citations omitted). Here, Plaintiffs' right to cast a ballot in the House District 28 election has been violated and thus Plaintiffs are likely to succeed on each of their claims.

1. **Virginia's Failure to Provide the Correct Ballot to Each Plaintiff Violates the Due Process Clause of the Fourteenth Amendment.**

Defendants' failure to provide voters the correct ballots for the Virginia House of Delegates election violated both substantive and procedural due process guarantees of the Fourteenth Amendment.

　　　a. **Substantive Due Process.**

"[D]ue process is implicated where the entire election process -- including as part thereof the state's administrative and judicial corrective process -- fails on its face to afford fundamental fairness." *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978). Indeed, "[i]f the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief . . . in order." *Id.* at 1077. But, "[s]uch a situation must go well beyond the ordinary dispute over the counting and marking of ballots; and the question of the availability of a fully adequate state corrective process is germane." *Id.* Nonetheless, "there is precedent for federal relief where," as here "broad-gauged unfairness permeates an election, even if derived from apparently neutral action. *Id.*[1]

---

[1] This *Griffin* standard has been adopted as the law of the Fourth Circuit. *See Hutchinson*, 797 F.2d at 1287 (quoting *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Griffin*, 570 F.2d at 1077)).

The systemic denial of ballots to qualified voters has fundamentally undermined the legitimacy of the House District 28 election. Eighty-six (86) voters entitled to vote in the HD-28, including plaintiffs Kenneth Lecky and D.D. Lecky, arrived at their proper polling place or requested and voted an absentee vote, but were denied the right due to the widespread errors in the government's records. In addition, 61 voters who should have received HD-88 ballots for another district instead -- mistakenly, but illegally -- cast ballots in HD-28. Untold numbers of other voters were, like plaintiff Phil Ridderhof, given the wrong ballot by poll workers. When this sort of "broad-gauged unfairness permeates an election, even if derived from apparently neutral action" it triggers the availability of "federal relief" under the Due Process Clause. *Id.* at 1077–78; *accord League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (balloting errors sufficient to state claim for a violation of the Due Process Clause); *Ury v. Santee*, 303 F.Supp. 119, 126 (N.D. Ill. 1969) (ordering new election when "failure of defendants to provide adequate voting facilities, plaintiffs and those similarly situated were hindered, delayed and effectively deprived of their rights" to vote). This was not a case limited to simple poll-worker error: the election administrators responsible for voter registration systematically failed to assign hundreds of voters to the correct house district. This systematic, broad-gauged unfairness of the election through the widespread failure of the election apparatus meets the fundamental unfairness test established in *Griffin* and therefore the Plaintiffs are likely to succeed on their substantive due process claim.

*Hutchinson v. Miller*, 797 F.2d 1279 (4th Cir. 1986), does not undermine Plaintiffs' substantive due process claims. In that case, the Fourth Circuit held that losing candidates could not seek damages under section 1983 for a depravation of their voting rights, and affirmed a directed verdict for defendants after failure of proof at trial of actual outcome determinative

unfairness in the election.[2] But in so doing, it adopted the *Griffin* standard, see note 1, *supra*) and cited with approval *Ury v. Santee*, which ordered a new election because "hundreds" of voters were disenfranchised by incompetent election administration. *Id.* at 124 ("Thus, in *Ury*, the court invalidated an election in which 'hundreds of voters were effectively deprived of their right to vote' when drastic reduction in the number of precincts rendered polling places so crowded as to be inaccessible." *Hutchinson,* 797 F.2d at 1287(citations omitted)).

### b. Procedural Due Process.

In addition, Plaintiffs have established a procedural due process violation, because the procedures employed in the HD-28 election did "not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." *Bush v. Gore*, 531 U.S. 98, 105 (2000).

*First*, it is apparent from the widespread misapplication of the established districts that the state did not employ a system with sufficient guarantees of reliability in district assignment to protect citizens' right to vote in the House District 28 election. Here, more than 1 in 200 voters in the General Election were assigned to the incorrect district. Whatever systems the election administrators had in place to avoid "the risk of erroneous deprivation of a citizen's liberty in the absence of sufficient process"[3] were clearly inadequate to the task.

*Second*, the Leckys and other erroneously reassigned voters received no notice that their right to vote in the HD-28 election would be revoked. "[D]ue process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Jones v.*

---

[2] That case was filed after the terms of the officials elected had expired, and the appeal was not heard until "nearly six years after the election." *Hutchinson*, 797 F.2d at 1286.

[3] *Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004) (O'Connor announcing the judgment of the Court).

*Flowers*, 547 U.S. 220, 226 (2006). Had the affected voters been notified of the change of their longstanding House District assignments, they would have been alerted to the error and they could have taken action to correct it—either by seeking a voluntary correction of the assignment from their local registrar or by filing suit prior to the election.

*Third*, voters' depravation of their right to vote was directly the consequence of their misplaced reliance on the government giving them the correct ballot for the House of Delegates election. Even in the context of polling place errors by temporary poll workers, the Sixth Circuit has suggested that disenfranchisement due to a voter's reliance on the government instructions violates due process. *See Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 223 (6th Cir. 2011).

*Fourth*, despite the knowledge of at least election administrators in Frederick City and the Virginia Department of Elections of these problems no later than 11 a.m. on Election Day, no attempt to provide a remedy to the affected voters was made. No opportunity was afforded for affected voters who had already voted to cast a provisional ballot for the HD-28 race alone, nor was any effort undertaken to correct the errors even for voters who had not yet voted. Nor were disenfranchised voters offered the opportunity to cast a ballot after the polls closed to remedy the state's own error. Nor is there any process available now to the voters under state law to remedy their disenfranchisement. *See* Section V.1.d, *infra*.

Taken individually or together, the state deprived Plaintiffs and other HD-28 voters to their rights to procedural due process.

   **c.** **Plaintiffs prevail even if no state actor acted with the specific intent to deprive a citizen of the right to vote.**

Although the Supreme Court held in *Daniels v. Williams*, 474 US 327, 342-43 (1986), that in the context of personal injury cases that the government's negligence is not sufficient to

establish a violation of a plaintiff's substantive due process right, that holding is limited to personal injury cases. *See Waybright v. Frederick Cty., Md.*, 528 F.3d 199, 205 (4th Cir. 2008) (describing "this body of law" as applying "where a claim sounds both in state tort law and substantive due process").[4] Where important due process protections for the right to vote are concerned, there is no such intent requirement. *See Hunter*, 635 F.3d at 243 (6th Cir. 2011) (suggesting without deciding "[t]o disenfranchise citizens whose only error was relying on poll-worker [innocently incorrect] instructions appears to us to be fundamentally unfair" in violation of the Due Process Clause); *cf. Strickler v. Greene*, 527 U.S. 263, 288 (1999) ("under *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment.").

Even in the personal injury context, the Supreme Court has expressly reserved the question of "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause," *Daniels*, 474 US at 335-36 n.3, and Fourth Circuit law allows such gross negligence claims. *See Justice v. Dennis*, 793 F.2d 573, 378-79 (4th Cir. 1986) ("In the absence of a Supreme Court ruling that gross negligence or reckless conduct cannot violate the fourteenth amendment, we adhere to our precedent that in some circumstances, a law enforcement officer may be liable to a pretrial detainee for not only malicious, but also reckless, wanton, or grossly negligent conduct.") "Gross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" *Elliott v.*

---

[4] The Second Circuit's holding of a strict intent requirement in due process cases related to elections in *Shannon v. Jacobowitz,* 394 F.3d 90 (2d Cir. 2005), is therefore not supported by Fourth Circuit's cabining of the holding, nor is it consonant with the Fourth Circuit's approval of the *Griffin* standard, which expressly provides relief even when the deprivation is "derived from apparently neutral action," *Griffin,* 570 F.2d at 1077. Moreover, the plaintiff in *Shannon* raised no procedural due process claim at all.


*Carter*, 791 SE 2d 730, 732 (Va. 2016) (internal citations omitted). That gross negligence standard is met here, where the danger of an erroneous depravation of Plaintiffs right to vote in HD-28 was known to election administrators by at least 11 a.m. on Election Day, and perhaps much earlier.

### d. No adequate remedy is provided by Virginia law.

This Court is the "only practical forum for redress." *Griffin,* 570 F.2d at 1065. This is not a case where Plaintiffs have an adequate state law remedy to address the depravation of their constitutional rights. *See Kendall v. Balcerzak*, 650 F.3d 515, 530 (4th Cir. 2011) (rejecting procedural due process challenge to invalidation of petition signatures because "there were adequate opportunities for review of the invalidation of Kendall's petition signature in state court").

The ongoing recount of the ballots cast on or before November 7 does not address the depravation of Plaintiffs' right to cast a ballot in the election, because voters like the Kenneth Lecky, D.D. Lecky, and Phil Ridderhof never cast an HD-28 ballot, and there is no way to isolate HD-28 ballots cast by voters who reside outside the district from legal votes.

The Virginia's election contest provisions are also unavailable to the Plaintiffs, because only a candidate, not a voter, can contest an election in Virginia. Va. Code Ann. § 24.2-803. And that remedy is inadequate because such a contest would be heard by the House of Delegates, *id.*, not a court. *See Roe v. Alabama*, 43 F.3d 574, 582 (11th Cir. 1995) ("[T]here is only one state remedy in this case: a contest in the legislature. The legislature, however, is not an adequate or proper forum for the resolution of the federal constitutional issues presented."), *certified question answered sub nom. Roe v. Mobile Cty. Appointment Bd.*, 676 So. 2d 1206 (Ala. 1995).[5]

---

[5] The Fourth Circuit's approving discussion of contests in *Hutchinson*, 797 F.2d 1279, is dicta and does not address legislative contests in Virginia, which appear to have no such body of law

### e. The Due Process Clause Applies Equally to the Broad-Gauged Dilution of HD-28 by Illegal Votes.

In addition to the 86 HD-28 voters barred from casting a ballot in that election, election officials allowed 61 voters who do not reside in HD-28 to cast ballots in the HD-28 election. These illegal votes "effectively 'stuff the ballot box,' implicating fundamental fairness issues." *See Roe*, 43 F.3d at 581 (upholding order to bar state from counting votes that were illegal under state law on due process grounds); *see also Reynolds*, 377 U.S. at 554.

## 2. Equal Protection Clause.

### a. Virginia's Failure to Provide the Correct Ballot to Each Plaintiff Impermissibly Burdens Plaintiffs' Right to Vote.

State and local election practices that unconstitutionally burden the fundamental right to vote are impermissible. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). The U.S. Supreme Court has set forth a "flexible standard" to resolve challenges to state election laws that burden voting rights. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 181 (4th Cir. 1983). Under this standard, courts "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

Under this framework, courts must not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" and instead must "make the 'hard judgment' that our adversary system demands." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008).

---

comparable to the body of law for Congressional contests which *Hutchinson* cited with approval. In any case, the *Hutchinson* court nevertheless adopted the *Griffin* standard.

When a restriction subjects the right to vote to a "severe" restriction, the restriction "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992).

Here, Virginia's failure to provide the correct ballot to each Plaintiff created a severe—indeed insurmountable—barrier to Plaintiffs' exercise of the franchise. Again, 87 HD-28 voters disenfranchised based on the state's actions. "[E]ven one disenfranchised voter . . . is too many." *LOWV*, 769 F.3d at 244. Accordingly, courts have routinely held that laws and policies that preclude citizens from voting impose severe burdens on the right to vote. *See, e.g.*, *One Wis. Inst., Inc. v. Thomsen*, No. 15-cv-324-jdp, 2016 WL 4059222, at *929 (W.D. Wis. July 29, 2016) (finding "severe" burden on the right to vote where approximately 100 people were disenfranchised).

These severe burdens dramatically outweigh the interests of Virginia *not* to provide voters the correct ballot. Indeed, it is difficult to imagine what cognizable interest Virginia would have in the maladministration of its own elections. To the extent that the state's burden is financial, that only serves to demonstrate that the Plaintiffs' depravation was the result of insufficient investments to safeguard their right to vote. The Virginia Board of Elections itself recognizes that the election in House District 28 was plagued by serious irregularities, and documented in detail the voters erroneously barred from voting in the election—and erroneously permitted to vote—in its certification. As such, it is likely that the Plaintiffs will prevail under the First Amendment and Equal Protection Clause claims in Count III of their complaint.

      **b.** **Virginia's Failure to Provide Correct Ballots Violates the Fourteenth Amendment Because it Treats Similarly Situated Voters Disparately Without a Rational Basis.**

The Fourteenth Amendment of the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend.

XIV, § 1. This "Clause requires that similarly[] situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). By impermissibly discriminating among voters in the House District election, the Defendants have violated the guarantees of the Equal Protection Clause.

The first step in determining whether government action violates equal protection is to identify the classification drawn by the government. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). As in this case, a law may impermissibly discriminate against a group of people in violation of equal protection by drawing express classifications. *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 388 (4th Cir. 2009). Here, Virginia gave some Virginia residents the correct ballots for the House District election. But, it gave other Virginia residents incorrect ballots, those for House Districts 2 and 88. The failure of Virginia to provide voters lawfully registered in Virginia with the correct ballot imposes a severe burden on the voters who cast those ballots.

If a class is treated differently, the second step is to "determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654. "[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). But at a minimum, a "challenged classification" must "be rationally related to a legitimate state interest." *Giarratano*, 521 F.3d at 303. There is no rational basis, let alone compelling interest, for treating some residents of House District 28 differently than other residents. "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66-69 (1978) (a state cannot arbitrarily

deny the franchise to citizens "physically resident within the geographic boundaries" of an electoral district) (collecting cases); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Accordingly, Defendants' failure to provide correct ballots was in violation of the Equal Protection Clause.

### c. Virginia's Failure to Provide Correct Ballots Arbitrarily Imposes Disparate Treatment on Similarly Situated Voters.

Finally, the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution also guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Indeed, the equal "right to vote is protected in more than the initial allocation of the franchise." *Hunter*, 635 F.3d at 234 (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)). "Equal protection applies as well to the manner of its exercise." *Id.* Accordingly, a state may not impose "'arbitrary and disparate treatment'" on similarly situated voters. *Id.*; *see also Brunner*, 548 F.3d 463, 477 (holding that in the context of voting equal protection requires "'nonarbitrary treatment of voters'" (quoting *Bush*, 531 U.S. at 105)).

By providing correct ballots to some HD-28 voters in the House District Election, but providing incorrect ballots to other HD-28 voters in the election, Defendants treated some voters differently than other voters. This disparate treatment of Virginia voters based solely on where they live is arbitrary and there is no rational justification for such a differentiation. Accordingly, Defendants' arbitrary failure to provide correct ballots was in violation of the Equal Protection Clause. *See Hunter*, 635 F.3d at 234.

### B. Plaintiffs Will Suffer Irreparable Harm If Defendants Are Not Restrained.

There is no adequate damages remedy for disenfranchisement. Thus, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *LOWV*, 769 F.3d at 247 (collecting cases). "[T]he basic truth [is] that even one disenfranchised voter-let alone several thousand-is too many." *LOWV*, 769 F.3d at 244; *see also One Wis. Inst., Inc.*, 2016 WL

4059222, at *929 (finding severe burden where about 100 otherwise qualified voters were disenfranchised because of Wisconsin's voter identification law). Indeed, the violation of a constitutional right has long been recognized to constitute an irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

C. **A Weighing of the Equities Decidedly Favors Plaintiffs.**

"[A]ny harm that would result from a slight delay in [resolving] the election results is minimal in comparison to the irreparable injury that occurs when an individual suffers the loss of his constitutional rights." *Awad v. Ziriax*, No. CIV-10-1186-M, 2010 WL 4676996, at *5 (W.D. Okla. Nov. 9, 2010); *see also Stein v. Thomas*, 672 Fed. Appx. 565, 569-70 (6th Cir. 2016) (upholding injunctive relief to modify state law procedures to avoid extinguishing voters' rights to accurate election returns).

In particular, delegates elected at the November 2017 general election will not be sworn in until the first day of the legislative session, January 10, 2018, see Virginia Constitution art. IV, sec. 6, and a special election can be held only 10 days after a vacancy is declared, Va. Code Ann. §§ 24.2-216, 24.2-683. Consequently, a prompt ruling requiring a new election could avoid a vacancy for House District 28 altogether.

Moreover, the burden of an injunction in this case is a burden of the state's own making: any cost it faces to hold a special election here is only as a consequence of its violations of its citizens' rights to vote. Balanced against the harm that will be suffered by Plaintiffs if the temporary injunction is not issued -- the irretrievable loss of the right to vote in an election to determine their elected representative in the House of Delegates for the next two years -- the balance of harms is decidedly in favor of Plaintiffs.

**D.     The Requested Relief Will Advance The Public Interest.**

The public interest favors the vindication of constitutional rights. *See, e.g.*, *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ("[U]pholding constitutional rights surely serves the public interest"); *see also Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). That is particularly so where voting rights are implicated because "[t]he public has a 'strong interest in exercising the fundamental right to vote.'" *LOWV*, 769 F.3d at 248 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As the Fourth Circuit has explained, "[b]y definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *Id.*

Often, the remedy to constitutional defects in the administration of an election is to require the state to count the votes it intends to exclude, *Hunter*, 635 F.3d at 245-46, or else to enjoin an unconstitutional procedure being employed to count the votes, *Bush v. Gore*, 531 U.S. at 110-11. Unfortunately, neither of those remedies can cure the constitutional defect here: the disenfranchised voters were never permitted to cast a ballot, and the state has comingled the illegal votes cast by non-residents of HD-28 with legal votes. Consequently, it "impossible ever to know [whether] (the apparent winner) had truly won the election because of the nature of the voting irregularities (that is, the alleged constitutional error placed in everlasting doubt what was the true result of the election)." *Roe*, 43 F.3d at 585 (Edmonson, J., dissenting).

In such a case, the proper remedy is a new election. *See Griffin*, 570 F.2d at 1080 (citing Kenneth W. Starr, Federal Judicial Invalidation as a Remedy for Irregularities in State Elections, 49 *N.Y.U. L. Rev.* 1092, 1124-26 (1974)); *see also* Steven F. Huefner, Remedying Election Wrongs, 44 *Harv. J. on Legis.* 265, 307 (2007) (a court should "call [a] new election" when the number of "[l]egal votes necessarily excluded" or the "[number] of illegal votes" "creates reasonable uncertainty" in the election's outcome). Although the "the closeness of the election"

may be relevant in determining a plaintiff's right to relief, a plaintiff need not establish that with "mathematical certainty" that the errors in the election's administration tipped the outcome of the election. *Griffin,* 570 F.2d at 1080. Rather, "invalidation of a potentially controlling number of the votes cast" is sufficient. *Id.*; *accord Ury*, 303 F.Supp. at 125 ("In view of the substantial numbers of voters who were unable to cast their ballots the inability of such voters to cast their votes had the effect of either changing the election results or rendering such results doubtful."). Here, the 147 votes unlawfully cast or unlawfully prevented from being cast exceeds the 82-vote margin between the candidates, making this the rare case that standard is met.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enter an order enjoining Defendants from seating Bob Thomas, Jr., in the Virginia House of Delegates as the duly elected delegate for House District 28 and requiring a special election to fill the vacancy.

Respectfully submitted,

Dated: December 6, 2017

By: *Aria C. Branch*
Marc Erik Elias (*pro hac vice*)
Bruce V. Spiva (*pro hac vice*)
Brian Simmonds Marshall
(*pro hac vice* pending*)*
Aria C. Branch (VSB No. 83682)
Perkins Coie, LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 434-1627
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: BMarshall@perkinscoie.com
Email: ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on December 6, 2017, I filed the foregoing with the Clerk of the Court using the ECF System which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

Date: December 6, 2017

                                          *Aria C. Branch*
                                          Aria C. Branch