1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION


3
    ------------------------------x
4                                 :
    KENNETH J. LECKY, et al       :
5                                 :
                    Plaintiffs    :
6                                 :
              versus              : Civil Action Number
7                                 :
    VIRGINIA STATE BOARD          : 1:17-CV-1336
8   of ELECTIONS, et al           :
                                  :
9                   Defendants.   :
    ------------------------------x
10
                              January 5, 2018
11
              The above-entitled Motion for Preliminary
12  Injunction was continued before the Honorable T.S. Ellis, III,
    United States District Judge.
13
              THIS TRANSCRIPT REPRESENTS THE PRODUCT
14            OF AN OFFICIAL REPORTER, ENGAGED BY THE
              COURT, WHO HAS PERSONALLY CERTIFIED THAT
15            IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
              THE CASE AS RECORDED.
16

17

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3                Bruce Spiva
                 Brian Marshall
4                Aria Christine Branch
                 Perkins Coie LLP (DC)
5                700 13th St NW
                 Suite 600
6                Washington, DC 20005-3690

7   FOR THE DEFENDANT: (G. Paul Nardo)

8                Joshua David Tully
                 Emmet Flood
9                Williams & Connolly LLP (DC)
                 725 12th St NW
10               Washington, DC 20005

11  FOR THE DEFENDANTS: (Doug Filler, Cathie Braman, Aaron Markel)

12               Michael Robert Ward
                 McCandlish Holton Morris PC
13               1111 E Main St
                 PO Box 796
14               Suite 2100
                 Richmond, VA 23218-0796

15
    FOR THE DEFENDANTS: (Gregory Riddlemoser, Marc Hoffmann, Marie
16  Gozzi)

17               Michael Gordon Matheson
                 Thompson McMullan PC
18               100 Shockoe Slip
                 3rd Fl
19               Richmond, VA 23219-4140

20  FOR THE DEFENDANT: (Virginia State Board of Elections)

21               Anna Tillie Birkenheier
                 Office of the Attorney General (Richmond)
22               202 North 9th Street
                 Richmond, VA 23219
23

24

25

1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT: (Robert M. Thomas, Jr.)

3                Trevor Marshall Stanley
                Patrick Lewis
4                Baker & Hostetler LLP (DC)
                1050 Connecticut Ave NW
5                Suite 1100
                Washington, DC 20036

6

7

8

9

10

11

12

13

14

15

16

17

18

19
         OFFICIAL UNITED STATES COURT REPORTER:
20
                MS. TONIA M. HARRIS, RPR
21              United States District Court
                Eastern District of Virginia
22              401 Courthouse Square
                Ninth Floor
23              Alexandria, VA 22314
                703-646-1438
24

25

1        **P R O C E E D I N G S**

2

3        THE DEPUTY CLERK:  Kenneth J. Lecky, et al. v.

4   Virginia State Board of Elections, et al.  Civil Case Number

5   17-CV-1336.

6        Counsel, please come forward and identify yourself

7   for the record.

8        THE COURT:  All right.  Who's here for the

9   plaintiffs?  Who is here on behalf of the plaintiffs, please.

10        MR. SPIVA:  Your Honor, this is Bruce Spiva from

11   Perkins Coie and with me is my colleagues, Aria Branch and

12   Brian Marshall.

13        THE COURT:  Who will argue today?

14        MR. SPIVA:  I will, Your Honor.

15        THE COURT:  All right, sir, would you spell your

16   last name for the court reporter.

17        MR. SPIVA:  Yes, Your Honor.  It's Spiva, S, as in

18   Sam; P, as in Paul; I; V, as in Victor; A.

19        THE COURT:  All right.  Mr. Spiva, good afternoon to

20   you.

21        MR. SPIVA:  Good afternoon, Your Honor.

22        THE COURT:  Now there are a plethora of defendants.

23   I didn't even count them all, but who is here today who

24   expects to be heard?

25        MR. MATHESON:  Good afternoon, Your Honor.  My name

1  is Mike Matheson.  I'm with the law firm Thompson McMullan.  I

2  represent Registrar Gregory Riddlemoser, Registrar, Marc

3  Hoffmann.

4            THE COURT:  All right.  You've submitted a number of

5  pleadings in this matter, briefs.

6            MR. MATHESON:  Yes, Your Honor.

7            THE COURT:  All right, so.  Your last name, sir?

8            MR. MATHESON:  Matheson.

9            THE COURT:  Matheson.  All right.  You will speak.

10  Who else wishes to be heard.

11            MR. STANLEY:  Your Honor, my name is Trevor Stanley.

12  I'm here on behalf of defendant Robert N. Thomas, Jr., an

13  intervenor with the Republican Party of Virginia, Danielle J.

14  Davis and Mark Cole.

15            Patrick Lewis, my colleague, will be speaking on

16  behalf of the parties.  His admission for pro hac vice is

17  still pending before the Court.

18            THE COURT:  I'm sure I've entered it by now.  Did

19  you pay the fee?

20            MR. STANLEY:  Yes, Your Honor.

21            THE COURT:  That's what matters.

22            What is your last name, again, Lewis?

23            MR. LEWIS:  Yes, Your Honor, Lewis, L-E-W-I-S.

24            THE COURT:  All right.  Anyone else expects to be

25  heard this afternoon on this motion for a preliminary

1    injunction?

2           MS. BIRKENHEIER:  Your Honor, I am Anna Birkenheier

3    and I'm here today on behalf of the governor of Virginia, the

4    Virginia State Board of Elections and the individual members,

5    the Department of Elections and the Commissioner of Elections,

6    Edgardo Cortes.

7           THE COURT:  So you have a lot of clients?

8           MS. BIRKENHEIER:  Yes, Your Honor.

9           THE COURT:  And you also hope to be heard today.

10          MS. BIRKENHEIER:  Briefly, Your Honor.

11          THE COURT:  You may be seated for a moment.

12          MR. TULLY:  Your Honor.

13          THE COURT:  Oh, someone else.

14          MR. TULLY:  I just wanted to introduce myself.

15    Joshua Tully from Williams and Connolly on behalf of G. Paul

16    Nardo, the Clerk of the Virginia House of Delegates.  I would

17    like to introduce my colleague, Emmet Flood, who is admitted

18    pro hac vice.  We don't expect to be heard unless the Court

19    needs to hear from us.

20          THE COURT:  And whom do you represent?

21          MR. TULLY:  The clerk of the Virginia House of

22    Delegates.

23          THE COURT:  All right.  And you haven't filed

24    anything, have you?

25          MR. TULLY:  We have.

1          THE COURT: You have.

2          There's been so much paper I would expect to see a

3    map of the western United States that shows that it's been

4    blighted by this case.  Anyway you may be seated for a moment.

5    You'll forget -- I apologize for the delay.  And I know there

6    are a lot of people here who came earlier, but there were

7    other things I had to do.  I apologize to all of you for the

8    delay.  Let me tell you what I intend to do.

9          MR. WARD:  Your Honor, there's also myself, Michael

10   Ward, counsel for Doug Filler, Cathie and Aaron Markel.

11         THE COURT:  Counsel for whom?

12         MR. WARD:  Doug Filler, Cathie, and Aaron Markel,

13   they are electoral board members.

14         THE COURT:  All right.  Do you wish to be heard

15   today?

16         MR. WARD:  Your Honor, to the extent that something

17   arises I may be needed to be heard.  I'm not expecting to.

18         THE COURT:  What I intend to do is take a brief,

19   brief recess.  Five minutes.  No more.  Mostly to replenish my

20   water.  And then I will hear from the plaintiffs on their

21   motion for a preliminary injunction.  And then I will hear

22   from those defendants who wish to be heard.

23         I'm going to do it this way.  I am, not

24   surprisingly, not unfamiliar with this case, not unfamiliar

25   with the facts and I'm not unfamiliar with the large number of

1  pleadings that have been filed.  And I know there are lots of

2  people interested in it.  But there are lots of people

3  interested in many cases.  And even if there are only a few

4  people interested, it certainly is important to the people,

5  the few who are.  Witness the last litigant.  So I have paid

6  careful attention to your submissions, including one

7  yesterday, if not last night.  I can't remember which, but

8  there's a very, very recent filing that I'm familiar with.  So

9  what I intend to do is to give the plaintiffs an unfettered

10  opportunity.  I know the facts, I know the contentions.  I

11  would be very surprised if you say anything striking or new,

12  but I'm going to give you the opportunity to say anything

13  striking or new.  The only difference being that it's only

14  going to be 15 or 20 minutes.  If you can't do it in 15 or 20

15  minutes, and in the -- the 100-some pages that I've already

16  seen, then it can't be done.

17         And then, I'll give you each a somewhat briefer

18  opportunity to be heard on matters.  But as I said, I am

19  familiar with the facts and the parties' contentions in this

20  case.  And that's how I intend to proceed.

21         I'll take another very brief recess and then we'll

22  proceed in this case.  Court stands in recess.

23         (Recess.)

24         THE COURT:  All right.  Who will be heard from the

25  plaintiffs?

1          MR. SPIVA:  I will, Your Honor.  Bruce Spiva.

2          THE COURT:  All right, Mr. Spiva.  You may proceed.

3          MR. SPIVA:  Thank you, Your Honor.  Before I start,

4     would it be possible for me to reserve like five minutes for a

5     rebuttal?

6          THE COURT:  You don't have to do it that formally,

7     but I'll give you an opportunity to respond briefly.

8          MR. SPIVA:  Okay.  Thank you, Your Honor.  And Your

9     Honor, the historic 2017 Virginia House of Delegates election

10    hopefully --

11         THE COURT:  All elections are historic.

12         MR. SPIVA:  Yes, well, this one may be more

13    historic, Your Honor, than others that hopefully will forever

14    put to rest the old saying that "every vote counts."

15         In this race, for HD-28, which is obviously the

16    subject of this lawsuit, as Your Honor knows, the certified

17    election results show a difference between the Republican

18    candidate, Robert Thomas, and the Democratic candidate, Joshua

19    Cole of 73 votes.  And what we now know, Your Honor, which I

20    don't believe was at least fully in the record at the time of

21    the TRO proceeding from the report of the Department of

22    Elections, which is attached to the declaration of Edgardo

23    Cortes, is that on election day a total of at least 147

24    people, over twice the difference, were either denied their

25    right to vote in HD-28 or were permitted to vote in HD-28 even

1   though they had no such right.  And that's why we're here,

2   Your Honor.  86 voters were not, who live in HD-28.  And

3   there's no dispute that they have a constitutional right to

4   vote -- right to vote, for their House of Delegates

5   representatives, were not allowed to vote.  And in addition,

6   61 voters who live outside the district were permitted to vote

7   in HD-28, thereby diluting the votes of the rest of the HD-28

8   voters.

9           None of these undisputed differences, Your Honor,

10  were due to poll worker error.  The current margin, as I

11  mentioned, is less than half of the number of the affected

12  voters.  And so what this means is that we cannot reliably

13  know whether the registered voters of HD-28, who exercised

14  their constitutional right to vote in the November election,

15  preferred Robert Thomas or Joshua Cole.  And because of secret

16  balloting there's no way for us to know that.

17          The City of Fredricksburg knew about the problems of

18  voters being misassigned between HD-28 and HD-88 for more than

19  two years and yet the problem was not fixed.  When the most

20  powerful person in the Virginia legislature, at the time

21  Speaker Howell raised the concern for officials in the -- in

22  2015, efforts were made to solve the problem right away.  Even

23  though absentee balloting for his primary election had already

24  begun.  When plaintiff here, Ms. D.D. Lecky, and other voters

25  raised the concern on election day in 2017, City officials

1 responded by removing the map from the polling place that

2 would have allowed other voters to discover the error.

3      Following -- Your Honor, there was a possible remedy

4 at hand when they learned about this on election day and that

5 would have been to follow the Virginia code and provide voters

6 who believed that they in fact knew, according to the map that

7 was on the wall in the precinct, that they were in HD-28 to

8 vote a provisional ballot until it could be straightened out.

9 After the election, if it turned out they, in fact, weren't

10 residents of HD-28, the vote could have not been counted and

11 if, as was the case with the 87 voters, they actually proved

12 to be residents, it could be counted.

13      But instead of using this statutorily prescribed

14 remedy to ensure that preelection administrative errors did

15 not result in disenfranchisement, the electoral board decided

16 the postelection remedy, which was -- wasn't and isn't

17 available to these voters, would be sufficient for any voter

18 affected by these errors.

19      So that's why we are here now. The pre-election

20 acts of officials disenfranchised these voters and diluted the

21 votes of the other HD-28 residents. And in Fredericksburg, at

22 least, the board denied these voters a remedy on election day.

23      Now the only remedy left to cure the constitutional

24 harm is a new election. And the only body with the authority

25 to order that new election, the only institution, Your Honor,

1  is this court.

2          THE COURT:  That didn't have to be true.

3          MR. SPIVA:  Well, for these voters --

4          THE COURT:  The answer is, it didn't have to be that

5  way.  It could have been remedied by the General Assembly.

6          MR. SPIVA:  The candidate --

7          THE COURT:  Is the answer to that yes or no?

8          MR. SPIVA:  Theoretically, Your Honor, yes.

9          THE COURT:  What do you mean "theoretically"?

10          This losing candidate could have instituted

11  proceedings to have the General Assembly address this issue.

12          MR. SPIVA:  The losing candidate.

13          THE COURT:  Yes or no.

14          MR. SPIVA:  Yes, the losing candidate, who is not

15  before the Court, could have brought a contest, Your Honor.

16          THE COURT:  All right.  In fact, what happened here

17  is that this losing candidate after a recount decided not to.

18          MR. SPIVA:  That is -- that's accurate, Your Honor.

19          THE COURT:  The reason for that may be that it

20  either didn't expect any remedy from the General Assembly and

21  it also knew that if proceeded in that way, that it might

22  disincline the Court to issue a remedy in view of the state.

23  That's why you did it that way.

24          MR. SPIVA:  It wasn't me, Your Honor.  The candidate

25  decided not to pursue a contest.

1        THE COURT:  So you all weren't in touch with the

2   candidate at all?

3        MR. SPIVA:  I'm sorry, Your Honor.

4        THE COURT:  You all weren't in touch with the

5   candidate at all?

6        MR. SPIVA:  When you say "you all" you mean my law

7   firm, Your Honor?

8        THE COURT:  Your parties and your law firm.

9        MR. SPIVA:  Well, the parties here today are three

10  voters --

11       THE COURT:  Just give me an answer, please.  It's

12  late.  Were you all in touch with this losing candidate?

13       MR. SPIVA:  The parties here were not, Your Honor.

14  The -- the, the -- I mean my law firm represented the

15  candidate in the --

16       THE COURT:  Never mind.  It's not material to my

17  decision tonight, but remember in the future if I ask a

18  question, answer it directly.  We don't have time to play

19  lawyers' games.  Proceed.

20       MR. SPIVA:  Okay, Your Honor.

21       Here the problem is so severe that the Government

22  officials that have institutional interest in resisting

23  federal court intervention, the state defendants, including

24  the bipartisan State Board of Elections and even some local

25  electoral board members believe that it is warranted in these

1  extreme circumstances.

2      Your Honor, there's a high likelihood of success on

3  the merits in this case.  And I won't repeat what's in the

4  briefs.  I think I just want to emphasize our substantive due

5  process claim and highlight the cases.  I know Your Honor is

6  familiar with them and dealt with some of these in your TRO

7  ruling, but I would like to take an opportunity to try to

8  convince you to see the cases the way that we view them.

9  Starting with *Griffin v. Burns*, the First Circuit case, there

10  the Court announced the standard that broad gauged in

11  unfairness that permeates an election, even if derived from

12  apparently neutral action, can make out a due process, a

13  substantive due process claim.  And that standard, Your Honor,

14  has been adopted by the Fourth Circuit.  Quoted with approval

15  by the Fourth Circuit in *Hutchinson* and in *Hendon*.  In that

16  case, Your Honor, the election officials believed that they

17  were doing the correct thing, the legal thing, the right

18  thing.  They gave out, as Your Honor knows, absentee ballots

19  to people in a primary race.

20      Later the Supreme Court of that state determined,

21  with some dissents, I might note, that under state law that

22  wasn't permissible in a primary.  And so the Court, the

23  federal court, stepped in and said there's no question that

24  the election officials that gave out these ballots weren't

25  trying to deprive anybody of their right to vote, but that

1   this would work a fundamental unfairness to then strike all of

2   these people's absentee ballots.  And I would submit, Your

3   Honor, that that's very akin to what happened here.  I mean we

4   have said in our briefs and I alluded to this in my opening

5   with the facts, there certainly was every reason why the --

6   this should have been discovered before election day.  There

7   were warning signs that were given to the Fredericksburg

8   Electoral Board that they all also shared with the State Board

9   of Elections and the Department of Elections.  And there was

10  never any kind of procedure to really check to see, despite

11  the fact that they knew that there had been misassignments.

12          So I think, even if there were a requirement of

13  showing intent, that can be met here, but the point I want to

14  make is, is that *Griffin* is a case that basic -- that has been

15  adopted by the circuit that basically says the type of intent

16  that is required is not, you know, an intent to deprive people

17  of the right to vote.  It's just this broad-gauged unfairness

18  that permeates an election.

19          Similarly *Ury v. Santee*, which I know Your Honor is

20  also familiar with, is a long lines case, where the electoral

21  board in that case took an action or the council, the city

22  council, to reduce the number of precincts available.  And

23  that resulted in untenable lines on election day.  That

24  resulted in many people not being able to exercise their right

25  to vote.  But the Court made an explicit finding, Your Honor,

1  in that case that the Board did not intend to deprive anyone

2  the right to vote. They reduced the number of precincts to

3  save money. It was reckless because there were -- there were

4  warning signs that they -- that the number of precincts they

5  were going to use was going to be insufficient. They weren't

6  careful enough. Again, very analogous, I think, to what

7  happened here. Warning signs ignored. And then inadequate

8  attempts to remedy the problem on the day of the election.

9  The -- you know here Ms. Lecky, you know, alerted,

10  came in and voted at nine a.m. in her precinct, and alerted

11  election officials right away that she -- before she voted she

12  alerted them that she thought she had the wrong ballot. After

13  she voted, she went and she talked to two members of the

14  electoral board and alerted them and actually took them to a

15  map -- and this is all in the record, in the declarations,

16  Your Honor -- and showed them that her street was well within

17  the district. They consulted with the State Board.

18  Ultimately the election officials and Fredericksburg's

19  decision was to not provide her with a provisional ballot and

20  instead of taking the map as a sign that maybe we should

21  investigate further here and maybe take further action, they

22  took the map down. The map was right. And the information in

23  the state system that created this broad-gauged unfairness,

24  Your Honor, that was incorrect. And a little bit more

25  investigation would have found that out. Very similar to what

1  happened in *Ury*.

2          And finally, Your Honor I would just like to

3  highlight *Krieger v. City of Peoria*, which is not Peoria,

4  Illinois, but I take it Peoria, Arizona, a 2014 case, where --

5  which we also cite in our briefs.  But there it was not only

6  purely a mistake that created the type of broad-gauged

7  unfairness that resulted in a new election being called, but

8  the mistake, according to the findings of the Court there,

9  wasn't even the mistake of the election officials, it was of a

10 printing company that they had engaged.  And twice they sent

11 out absentee ballots with the wrong -- without one of the

12 candidate's names on it.  And basically they said there's no

13 way we can cure this at this point, now that so many ballots

14 have gone out and so much time has passed.

15          The only way to allow the voters to exercise their

16 right to choose this particular candidate, whose name was left

17 off, is to have a new election.  Again, no finding of intent.

18 In fact, quite the opposite.  The election official was found

19 to not to be at fault at all, but it was so fundamentally

20 unfair that the Court said that the voters had to have another

21 shot at it.

22          Your Honor, we, I think, explain our other legal

23 theories in our briefs.  I won't go over that now.  I think I

24 do want to take just a moment to address a couple of the

25 cases, not all, but a couple of the cases that the defendants

1   -- not the defendants, but intervenors cite in their brief.

2           *Hutchinson v. Miller*, the Fourth Circuit case, again

3   it's a case that acknowledges that federal courts adjudicate

4   and have a role in adjudicating constitutional claims that

5   involve broad-gauged unfairness and basically cites to the

6   test that I mentioned a minute ago in *Griffin*.

7           Really *Hutchinson v. Miller* is really about whether

8   damages are available in a jury trial for alleged election

9   irregularities.  And ones that were brought long after the

10  election in question.  Really has, I think, other than the

11  fact that it adopts *Griffin* or cites *Hendon* that -- adopting

12  *Griffin*, really has little relevance beyond that, I think, to

13  this case.

14          *Hendon v. North Carolina State Board of Elections*

15  also adopts the *Griffin* language.  There the issue of intent

16  that was -- that came up there involved very particular

17  failures to print ballots properly.  The font on the ballot

18  and alleged failures and whether the size of the type was

19  right.  And essentially there the Court said, you know, those

20  are not the types of minute election administration issues

21  that we, as a federal court, properly will get into.

22          And what's more is that it did not lay down, Your

23  Honor, I would argue, a bright line rule that intent is

24  required to make out a due process claim.  It basically listed

25  that as one of the factors to consider.  The severity of the

1  deprivation, whether the deprivation was intentional or more

2  of a negligent failure to carry out state procedures and

3  whether it erodes the democratic process.

4          Your Honor, I think I will reserve the rest of -- of

5  my time for rebuttal unless Your Honor has further questions

6  for me.

7          THE COURT:  That's fine.  Your rebuttal is still

8  going to be about five minutes.

9          MR. SPIVA:  That's okay, Your Honor.  Thank you.

10          THE COURT:  All right.  Tell me again who you are

11  and who your client is as each of you who want to speak, you

12  may do so.

13          MR. LEWIS:  Your Honor, thank you very much.  My

14  name is Patrick Lewis.  I'm here on behalf of Intervenor, Bob

15  Thomas, as well as the affiliated intervenors.

16          THE COURT:  Who are all they?

17          MR. LEWIS:  The Republican Party of Virginia,

18  Danielle J. Davis and Mark L. Cole.

19          THE COURT:  That's enough.

20          MR. LEWIS:  Thank you, Your Honor.

21          THE COURT:  When you gave me a name, I had no idea

22  -- I don't remember all the names.  There must be 30 names.

23  Go on.

24          MR. LEWIS:  Your Honor, I do have a cheat sheet.

25  It's --

1          THE COURT:  You do have a what?

2          MR. LEWIS:  A cheat sheet, Your Honor.

3          THE COURT:  Oh, cheat sheet.

4          MR. LEWIS:  There are a lot of names.  You're

5     correct.

6          Your Honor, this case is fundamentally no different

7     today than it was on November 22nd when this Court held its

8     TRO hearing.  At that point the allegation was that --

9          THE COURT:  Well, the numbers have been refined.

10          MR. LEWIS:  Your Honor, yes, they absolutely have.

11     The allegation was somewhere between 80 and 668 voters as of

12     November 22nd.  The number appears now to be 147.

13          In terms of an order of magnitude, it really is --

14     is not materially different.  My understanding is that between

15     Stafford County and the City of Fredericksburg, there are

16     108,000 registered voters.  Of that 108,000 registered voters,

17     give or take, we're talking about 147 voters who it is alleged

18     received an incorrect ballot.  Either it received a ballot for

19     House District 28 and it should have received a ballot for a

20     different House District or received that -- or were not given

21     a ballot for House District 28 and should have been.  It is

22     unclear to me, as I stand here today, what that final number

23     is.  I'm aware that the Virginia Election Board has performed

24     an analysis.  There's a copy of that in the record.  You know

25     that remains to be seen.  We may never know the answer.  The

1  other candidate in the race, Mr. Cole, declined to commence a

2  contest, as was his right, under the Virginia state law.  And

3  that was a significant remedy that he should have pursued and

4  didn't.

5         Today, as of November 22nd, we are still talking a

6  garden-variety election concern or election irregularity, to

7  use the language in the case law.  There is no, under *Griffin,*

8  we're looking for to invalidate an election, we're looking for

9  broad-gauged unfairness, we're looking for a policy, we're

10  looking for a procedure, we're looking for a systemic error, a

11  systemic problem.  That problem is not present in this case.

12  The procedure in question is the -- is the voter presents

13  himself or herself to the polling place.  And is -- their name

14  is checked on the books and they're handed a ballot.  That's

15  the procedure.  There's nothing wrong with that procedure.

16         What we're talking about and my colleague, Mr.

17  Matheson, and his clients put the -- have spoken to this in

18  their brief, as the subject matter experts on the

19  administration of this election.  What we're fundamentally

20  talking about here are random chance errors.  We're talking

21  about one off, essentially coding errors, where specific

22  voters, maybe they should have been assigned in one district

23  and for, you know, or due to an error by essentially clerical

24  error were placed in a different district.

25         Again, we don't know the extent of the issues as we

1  stand here today, but every single number that we've been

2  given is on a tiny scale compared to the number of registered

3  voters in the relevant voting jurisdictions.  147 out of over

4  100,000 voters, you know, we're dealing with a tiny fraction

5  of a percent.

6          This is not analogous, in any respect, to some of

7  the cases that plaintiffs cite in their brief.  You know, they

8  cite *Griffin* where you have the state Supreme Court

9  retroactively invalidating 10 percent of the ballots that were

10  cast, based on a decision, a policy, of the Rhode Island

11  Secretary of State, to permit the use of these absentee and

12  shut-in ballots in a primary election.

13          Plaintiffs' counsel spoke about the *Krieger* case in

14  the district of Arizona in 2014.  Another great example.  In

15  that case, the problem was that the primary -- the absentee

16  ballot, 87 percent of the ballots in this particular election

17  for city council in Arizona were cast absentee.  The ballots

18  were printed with only two out of three of the names of the

19  qualified candidates for the Office of City Council.

20          Upon discovering the error, a second round of

21  ballots were printed.  Those ballots too, inexplicably,

22  omitted the name of the third candidate, leading to yet a

23  third set of ballots being printed and delivered.  Here the

24  broad-gauged unfairness was the remedy that the electoral

25  board in that case had prescribed, which was if the original

1   ballots, that first and second round ballot, was returned, it

2   would be counted.  And in fact those ballots were flying in as

3   the third round of ballots were going out.  And so the result

4   is that many, many, many ballots were being cast perhaps by

5   voters who had no idea that the third candidate was on the

6   ballot.

7          Here again, you have a single point source of a

8   problem.  You have a -- that permeates the election and calls

9   the fundamental unfairness of the election into account.  Not

10  the case in this matter.

11         When you look at *Bennett*, another case in the Ninth

12  Circuit, cited by plaintiffs, that case actually speaks very

13  eloquently to one of plaintiffs other arguments, which is this

14  concept that the number of potentially affected votes exceeds

15  the margin of victory for Delegate Elect Thomas and as a

16  result, you know, the ballots should be thrown out.

17         And here the key lesson from this case, at least to

18  my mind, is a -- the federal fundamental right to vote is not

19  implicated by these garden-variety election errors.  And

20  *Bennett* even talks about how a garden-variety election

21  irregularity generally does not violate the due process

22  clause, even if it affects the outcome.

23         In our papers, Your Honor, we cite to *Gamza*, to

24  *Powell*, to *Harris County*, all of which also stands for that

25  proposition.  And this makes a lot of sense.  The right to

1  vote is a personal right.  It's a fundamental right, but it's

2  also a personal right.  A lot of reasons that people vote.

3  And whether or not a ballot is counted correctly or if there's

4  some clerical error that results in somebody getting a ballot

5  in HD-88 when they should have had it in HD-28, the proper

6  analysis is directed at the -- the source of the problem and

7  the scope of the problem.  It's not looking at 100 ballots

8  were potentially affected in a race that was decided by 75

9  votes versus 150 votes.  The proper analysis, again, is the

10 scope of the problem and here the scope of problem is tiny.

11        Others I know on our side can speak to some of the

12 facts, but I've reviewed the e-mail traffic that was attached

13 to plaintiffs various pleadings, all I saw were specific

14 questions about specific voters and an electoral board that

15 made prompt efforts to remediate any problems that arose.  But

16 no sign along the way of a systemic problem.

17        Speaking to another one of plaintiffs' cases, Your

18 Honor, the *Ury* case, we would really note that case is very --

19 is distinguishable from our case as well.  In that instance,

20 you add an election, Your Honor, where you had 32 precincts,

21 voting precincts, that were shrunk to six.  Inadequate voting

22 machines, unequal counts of voters and were the result that

23 hundreds, I believe it was 397 voters, signed affidavits

24 stating that the lines were so long that they were turned

25 away.  Significant lines, significant problems, traffic

1  backups.  All sorts of chaos on election day in that matter.

2  None of which has been alleged here, let alone proven.

3         The last point that we would like to raise for

4  certainly on Mr. Thomas's behalf is whatever the ultimate

5  outcome of this litigation is, and we believe that a cause of

6  action has not been even viably stated.  I know our motion to

7  dismiss has already been filed in this case, but certainly the

8  voters of the 28th House District are entitled to have their

9  duly elected representative be seated next week.  You know,

10  even if there's a -- a special election that down the road

11  needs to be called by one -- whether through this court or

12  through some other proceeding, it would seem a very

13  significant intrusion certainly for the voters and for the --

14  and for the Virginia legislature to say that a duly-elected

15  representative cannot be seated.  You know, at least pending

16  the outcome of any proceedings.  So on that particular point,

17  we would especially urge the Court to not grant the

18  preliminary injunction and to allow Mr. Thomas to be seated

19  next week.

20         THE COURT:  Who's next?

21         MR. MATHESON:  May it please the Court.  My name is

22  Mike Matheson.  I represent five of the Local Election

23  Officials in this case.  Both registrars, Mr. Riddlemoser and

24  Mr. Hoffman.  Rene Rodriguez, who's the chairman of the

25  Fredericksburg City Electoral Board, as well as Marie Gozzi,

1  who is the vice chair of the Stafford County Electoral Board,

2  and Gloria Chittum, who's the secretary of the Stafford Board.

3            THE COURT:  You do need a cheat sheet.

4            MR. MATHESON:  Well, Your Honor, this is the third

5  lawsuit that relates to the same election that I've

6  represented some or all of these folks in, so I'm getting

7  quite familiar with these names after --

8            THE COURT:  This same election?

9            MR. MATHESON:  Yes, Your Honor.  Yes, Your Honor.

10           THE COURT:  This same dispute?

11           MR. MATHESON:  Well, not related to the provisional

12  ballots, but we've been in front of Judge Hilton related to

13  provisional ballots, or excuse me, absentee ballots, and we

14  had another lawsuit related to provisional ballots.  And so

15  it's -- it's been --

16           THE COURT:  But not lawsuits relating to this

17  election between HD-28 and 88?

18           MR. MATHESON:  Yes, Your Honor.

19           THE COURT:  They are related to it?

20           MR. MATHESON:  Well, yeah, none of them are pending,

21  but, yes.  So, Your Honor, here's my --

22           THE COURT:  I'm sorry.  I missed that.  You say

23  there are no pending lawsuits --

24           MR. MATHESON:  Not pending.

25           THE COURT:  -- related to this dispute?

1    MR. MATHESON:  They've all been dismissed, but not

2   pending.

3    THE COURT:  All right.  Thank you.

4    MR. MATHESON:  So Your Honor, here is my chief

5   concern.  I know that the Court has a lot of people who want

6   to be heard from today and I want to make the most studious

7   use of my time and the Court's time.  And my biggest concern,

8   my agenda up here right now is that from the amended complaint

9   to the motion for a preliminary injunction that gets filed in

10   this case, there is a factual narrative that essentially

11   starts on election day in 2017 and ends with the Cortes report

12   that identifies all of these voters that should have cast

13   votes in different races.

14    The reply brief in this case from the plaintiffs is

15   filed on December 29th, and the Court in -- and that is

16   essentially a do-over brief.  The Court is presented with a

17   brand new factual narrative and there are allegations related

18   to things in 2015 that are made in those briefs that -- where

19   they're trying to show that this is some kind of a

20   long-standing problem that has existed.  Not only were there

21   almost 80 pages of documents filed with that reply brief, but

22   then last night, after regular business hours, we have a whole

23   nother batch of documents related to all of this stuff in 2015

24   that were filed.

25    THE COURT:  Let me say something about that.

1          MR. MATHESON:  Yes, Your Honor.

2          THE COURT:  I don't sanction.  Well, let me use a

3   different word.  I don't invite or approve of last minute

4   filings.  This case is a little unusual because there wasn't a

5   schedule.  But lawyers have the notion -- some lawyers who

6   practice, what I call BFA law, brute, force, and awkwardness.

7   They file stuff whenever they want to and whenever they think

8   it might help their cause.  It doesn't help me.  It irritates

9   me.  And it's unfair to the other side.  But I understand how

10  important people feel this is and why they do what they do.

11  But they also need to understand that that isn't the way you

12  do things.

13         MR. MATHESON:  And I appreciate that.  And Your

14  Honor, I don't mean for this to sound like an ad hominem

15  attack on my opponents, because I do understand they're trying

16  to advocate for their position and there's been a lot of

17  documents that have been coming in --

18         THE COURT:  I don't allow people to keep filing

19  stuff.

20         MR. MATHESON:  I understand.  But this is my

21  concern.  My concern is A, that all this 2015 stuff that's

22  been injected into the record that we really haven't had a

23  fair opportunity to respond to is somehow either going to

24  color this Court's analysis in a way that is unwarranted or in

25  the event that this matter gets appealed, that there's going

1  to be a factual record in this case that may look unfavorable

2  to my clients.

3          So what I would like to do right now and I know the

4  Court is going to have very limited patience, there's a couple

5  of documents that I want to hand up.  And I want to talk

6  about --

7          THE COURT:  So you want to do it too?

8          MR. MATHESON:  I do, Your Honor and I --

9          THE COURT:  That's fair play.

10         MR. MATHESON:  I brought a couple of witnesses today

11  and I know that Your Honor doesn't want to hear from

12  witnesses, but I would like to proffer a couple of things and

13  here is where I'm going with all of this.

14         THE COURT:  Do so, but do it quickly, please.

15         MR. MATHESON:  This 2015 stuff has nothing to do

16  with the issue in this case.  It demonstrably has nothing to

17  do with the issues in this case.  And so in order to do that,

18  I need to do two things:  Number one, I want to show the Court

19  there are street files in VERIS.  And I talked about this in

20  my brief.  And the Cortes report identifies specific address

21  locations that were affected by this.  There are street files

22  in VERIS.  And I'm going to hand the Court an exhibit that

23  Registrar Riddlemoser put together for me that gives you a

24  summary of what those street files are.  And then I want to

25  talk about Speaker Howell in 2015.  Because I have a copy of

1    Speaker Howell's complaint.  And I can show you that Speaker

2    Howell's complaint had absolutely nothing to do with the

3    voters who were impacted by what happened here.

4            So if I may, Your Honor, I want to hand an exhibit

5    and I have copies -- I have eight copies which I think will

6    give every camp their own copy of the document.  If I can hand

7    this to Your Honor.  And I'm also going to pass up the

8    communication from Speaker Howell from 2015.

9            THE COURT:  All right.  Go on.

10           MR. MATHESON:  And let me tell you what we're

11   looking at.  So this report -- this table right here has got

12   the street and address range numbers that the Cortes report

13   identifies as having been misassigned during the 2017 election

14   cycle.  And Mr. Riddlemoser, to his credit, has done a bunch

15   of work here.  He actually went and tried to figure how many

16   voters were affected versus how many actually voted.  His

17   number, as it turns out, is even bigger than Mr. Cortes'.  He

18   found that there are 150 voters who were affected rather than

19   147.  So there's a margin of error with this process too.

20   That's a digression.

21           Here is the important part.  So we have this e-mail

22   chain from Speaker Howell and Speaker Howell's contention is

23   that 201 is listed in the Code of Virginia as being in House

24   District 28, but Fredericksburg city is treating it as a split

25   precinct.  So he has an attachment to this that starts on

1   State Board of Elections page 1004. And I literally got this

2   two days ago. He has an attachment to this, and the

3   attachment includes a list of every voter that he claims has

4   been affected by a misassignment to a district in House

5   District 201. And I'll let the plaintiffs fact check me on

6   that. And I'll cut to the chase and tell you what you're

7   going to find. If you go through this and you look at every

8   single one of these addresses in this packet, there is not one

9   address that was identified by Commissioner Cortes in his

10  report.

11          So this -- what has been represented is that -- and

12  the plaintiffs -- I'm not saying there's any nefarious

13  misrepresentation here -- I just don't think that they

14  understand. When Howell was complaining back in 2015, he was

15  talking about something that's completely different than the

16  issues that affected voters in this election.

17          Now here is what he was talking about. He was

18  talking about a discrepancy between the Code of Virginia which

19  defines the precincts in Fredericksburg city versus the

20  precincts as they exist in Fredericksburg city. So recall in

21  my brief I said that there is redistricting -- following

22  redistricting, that the localities sometimes need to adjust

23  their precinct boundaries so that their local elections

24  conform to constitutional and state requirements.

25  Fredericksburg did that in November of 2011. When

1    Fredericksburg did that, they had historically had one split

2    precinct.  Well, as a result of the 2011 ordinance, they had

3    three split precincts.  This has been a source of

4    consternation in Fredericksburg city for years and years and

5    years.  And Howell was confused about this in 2015.  He

6    thought that 201 should not have been split and it turns out

7    that he was looking at the wrong source of law.

8           And in 2016 this issue came up again.  And so

9    there's an e-mail that has been submitted by the plaintiffs

10   from Brooks Braun in which Mr. Braun says sorry this took so

11   long but you will be relieved to hear that everything is a-ok.

12   And this has been represented as a statement that somehow

13   misassignments or incorrect street files for voters as between

14   28 and 88 had been corrected, but demonstrably that's not what

15   this document says.  What Mr. Braun is saying is, this

16   explains the difference between the code language and the

17   current maps.  It also explains why you would have three

18   splits in elections since 2011 and why that is perfectly fine.

19   He's not talking about street files being incorrect.  Mr.

20   Braun is talking about the confusion in the complaints that

21   they're receiving due to discrepancies existing between the

22   code as it was passed in March of 2011 and the ordinance that

23   adjusted those precinct boundaries in November of 2011.

24          The upshot of all of this, Your Honor, is that

25   this argument that this is some kind of a known problem that

1   goes back two years is simply not correct.  It's not correct.

2           There's a second argument that's raised in the

3   reply brief and that is a new suggestion that somehow the

4   election officials in Fredericksburg city should have handed

5   out provisional ballots to all the voters at the VFW in

6   precinct 402 on election day.

7           Well, Your Honor, and there is -- and there's an

8   e-mail from Kathleen Dooley, who is the city attorney.  I'm

9   not sure how the plaintiffs got ahold of it.  It seems like

10  it's privileged to me, but it's been disseminated by third

11  parties.  And I don't have any control over that.  But this

12  e-mail is really interesting because what it demonstrates is,

13  A, that precinct 402 is the only thing that is on

14  Fredericksburg city's radar as a result of D.D. Lecky's

15  complaint at the polling location.

16          If you go to the Riddlemoser report and you look

17  at these street files, the misassignments not only happen in

18  402, but they also happen in 201 which nobody was thinking

19  about that on election day.  And then above that you have

20  Stafford County 302, Stafford County 203, Stafford County 402,

21  Stafford County 103, 702, 703.  The vast majority of these

22  votes.  Even if the Court were prepared to find that something

23  more should have been done with respect to the VFW,

24  approximately two-thirds of the votes that are even at issue

25  in this case, was something that nobody had any idea existed

until two weeks after the election when Mr. Cortes issued the
Cortes report.

And so what is the remedy there?  They're saying
hand out provisional ballots.  Well, number one, we had no way
of pinpointing every single voter that was affected by this,
identifying that person when they walked in to hand them a
provisional ballot.  That's one problem.

So the only thing that we could have done
provisionally would have been to hand out a provisional ballot
to all 1,954 voters who walked through the door, which is a
nightmare.  There were 36 provisional ballots in
Fredericksburg city.  They would have had to canvass all 2,000
of those within seven days after the election.

But the bigger problem is -- and this is exactly
what the Dooley e-mail says, "There is no authority in the
Code of Virginia for casting a provisional ballot based on an
error in the street file or a -- an erroneous House District
designation in VERIS."  And if the plaintiffs disagree with
me, I challenge them to tell me where in the Code of Virginia
it says that you can cast a provisional ballot under that
circumstance.  So had we provisionally balloted all 1,954 of
those people, we probably would have a bigger problem on our
hand than we did -- than we do right now.  We would have a
1,954 voter problem on our hand instead of a 150 voter
problem.

1          So both of those arguments are brand new as of

2    December 29th.  And I've done quite a bit of investigation on

3    that and I just don't think that there's any merit to them.

4          So here is what we're looking at:  The plaintiffs

5    have asked Court to order a special election.  If that occurs,

6    then there's going to be within five weeks under the code a

7    special election would have to be convened.  Mr. Riddlemoser,

8    who only has Stafford, which is just a fraction of House

9    District 28.  It's a large fraction but it's a fraction of

10   House District 28.  He informs me today that between military

11   and other absentee balloters, just in Stafford County, he had

12   1100 people.  Well, he needs 45 days just to give them notice

13   of absentee balloting under Virginia law and under the federal

14   statute, which is called UOCAVA.  He's required to do that.

15   If he doesn't do it, then those absentee ballots get counted

16   whenever they come in.  Two weeks, three weeks, two months,

17   three months, four months after the special election happens.

18   So if we have that special election, how many of those voters

19   are going to be disenfranchised?

20        THE COURT:  Well, I appreciate your bringing to my

21   attention the practical problems that may arise if I order a

22   special election, but that isn't quite the issue today.

23        MR. MATHESON:  Well, no, Your Honor only insofar as

24   it affects the balance of the public interest in holding a

25   special election.  And I'll stop my analysis.

1          But this is my point:  I mean the election has got

2    to have a beginning and an end.  And the record that the

3    plaintiffs have shown at best shows that there were

4    independent clerical errors that were made and clerical

5    errors, which I do not think are unique to this jurisdiction,

6    and we've seen no evidence to the contrary, that are unique to

7    these two particular jurisdictions.

8          There were inadvertent clerical errors that were

9    made, they were unknown on the day of the election.  Now we

10   know about them.  Prospectively, do we need to go and fix

11   those?  Yes, we do.  Does that warrant federal intervention in

12   this local election?  I believe under the authorities that

13   have been briefed -- and I know I'm running out of time so I'm

14   not going to delve into the case law, Your Honor --

15         THE COURT:  You are, because I'm running out of

16   time.

17         MR. MATHESON:  That relief is unwarranted.  So I

18   appreciate your patience.  Thank you, Your Honor.  I yield the

19   floor.

20         THE COURT:  All right.  I'm going to mark these two

21   documents as Exhibits 1 and 2.  But it will be for which

22   party?

23         MR. MATHESON:  For the registrars.

24         THE COURT:  Registrar, et al parties.

25         All right.  Who's next?  Nobody else needs to be

1 heard?

2          MS. BIRKENHEIER:  No, Your Honor.

3          MR. FLOOD:  Your Honor, if I may be heard briefly.

4          THE COURT:  Yes, you may.

5          MR. FLOOD:  Emmett Flood for G. Paul Nardo, who is

6 the clerk of House of Delegates.

7          THE COURT:  All right.

8          MR. FLOOD:  Mr. Nardo is -- has been made a

9 defendant in the case and among the forms of relief sought by

10 the plaintiffs.  One, Your Honor is federal judicial

11 intervention to stop Mr. Nardo from recognizing Mr. Thomas,

12 the presumptive winner of District 28, and seating him in the

13 House of Delegates come noon next week on the opening day of

14 the session, January the 10th.

15          Of course plaintiffs have also sought relief in the

16 form of an injunction to in effect nullify the election and

17 have Your Honor order a new one.

18          Mr. Nardo is not a political actor here.  He is an

19 employee of the House of Delegates.  He does not serve in that

20 roll as a partisan Republican or Democrat.  He is at pains, I

21 think, to underscore for the Court that he takes no position

22 on the due process or other questions presented by the

23 plaintiffs as to whether a new election is called for.  But

24 precisely because he is an employee of the House of Delegates,

25 he has in this case the interest that the House of Delegates,

which is part of the legislative branch in the Commonwealth

has, when it comes to the question of whether a federal court

should do something.

And the position we've taken in the brief is a

simple one, and Mr. Nardo's view of that is, that if the Court

finds that a remedy is needed here, it ought to suffice Mr.

Nardo suggests, that the Court issue that remedy against the

various election boards and not pursue anything against him in

his official capacity as the clerk.

If Your Honor were to nullify the election or order

a new one Mr. Nardo, who will sit in the chair, the Speaker's

chair at the very beginning of the proceedings next week at

noon -- if Your Honor nullifies the election, he will not

recognize Mr. Thomas or anyone else because it is the historic

practice, one that he intends to continue to represent on

opening day, only that person who presents the appropriate

credentials, which in this case is a certification that he is

the victor in that race.

So if something happens, if Your Honor decides to do

something about the election, he submits there's no need to do

anything with him because he will not recognize anyone who

does not have a certificate of election.

If Your Honor does not take action against -- to do,

undo the election or order a new election, then it is his

present expectation, consistent with historic practice, to

1　recognize Mr. Thomas today pending our finding something in

2　the state precedence, in the legislative precedence that might

3　change that.  Otherwise that's his position and he asked that

4　I communicate it to Your Honor.

5　　　　　THE COURT:  Anyone else want to be heard?

6　　　　　MR. FLOOD:  Thank you, Your Honor.

7　　　　　MS. BIRKENHEIER:  Your Honor, we'd ask if we could

8　be heard.  But given the process you've outlined and the

9　Court's familiarity with the pleadings, we don't feel that's

10　necessary.

11　　　　　THE COURT:  I'm sorry.  I'm unable to hear you.

12　Come to the podium, if you would, please.

13　　　　　Give us your name and the party you represent and

14　tell me whatever you need to tell me.

15　　　　　MS. BIRKENHEIER:  Certainly.  My apologies, Your

16　Honor.  I am Anna Birkenheier on behalf of the Governor, the

17　State Board of Elections and its members, the Department of

18　Elections and Commissioner Edgardo Cortes.

19　　　　　I just wanted to indicate that while we had

20　initially represented we would like to make argument, given

21　the process that the Court has outlined and the Court's

22　familiarity with the pleading, we are happy to rely on our

23　filings unless there are any specific questions the Court may

24　have for us.

25　　　　　THE COURT:  Thank you.  Anyone else?

1          MR. WARD:  Good afternoon, Your Honor.  Michael Ward

2     for Doug Filler, Cathie Braman, and Aaron Markel.  They're

3     individual members of the electoral boards.  They were sued in

4     their official capacities.  Your Honor, the only point that I

5     would make is that I have just recently been retained to

6     represent Ms. Cathie Braman.  She signs onto the brief that I

7     filed on behalf of Mr. Filler and Mr. Markel.  And that's

8     already in the file.  She simply signs onto it.  We took no

9     position other than pointing out that in their official

10    capacity there's no allegations that these three individuals

11    did anything wrong themselves.  But otherwise, as the state

12    did, take no position on the motion sought.

13         THE COURT:  Anyone else?  All right.  You have five

14    minutes or less.

15         MR. SPIVA: Your Honor, I think it would be less.

16         I wanted to first just address the procedural issue,

17    Your Honor.  The documents that we filed with our reply brief,

18    we didn't have any of those documents at the time we filed our

19    initial brief.  We got those mainly through FOIA requests

20    after the time that we filed our brief.  As Your Honor is

21    aware --

22         THE COURT:  You don't want me to ask you when did

23    you get them.

24         MR. SPIVA:  You know, I actually --

25         THE COURT:  Why did you wait until last night.

1 Never mind, it happened.  Don't do it in the future.

2         MR. SPIVA:  Your Honor those documents we just got

3 yesterday or maybe they were Wednesday.

4         MR. MARSHALL:  Wednesday.  Wednesday, filed on

5 Thursday.

6         MR. SPIVA:  Wednesday, filed on Thursday, Your

7 Honor.  I'm talking about the documents that we filed with the

8 reply brief on the 29th, which is I think was causing the

9 consternation and those documents we had gotten within a very

10 short period of time before we filed that and it was certainly

11 after we filed our initial --

12         THE COURT:  Let me tell you this and we're not going

13 to spend anymore time on it.  In this court, if there's a

14 briefing schedule, you must adhere to it or seek leave to

15 deviate from it.  In this instance, there was no firm briefing

16 schedule, but there was a local rule.  The local rule says you

17 file, somebody gets 11 days to respond.  What you should have

18 done is said, Look, can I have leave to give you all of this

19 stuff?  And so do that in the future.

20         What else do you have?

21         MR. SPIVA:  Yes, Your Honor.  I do want to point out

22 we did file a motion for leave and we had requested

23 everybody's position.

24         THE COURT:  Last night?

25         MR. SPIVA:  No, Your Honor -- yesterday for the --

1   for the documents that we filed yesterday.

2           THE COURT:  Yes.

3           MR. SPIVA:  We asked for leave.

4           THE COURT:  As a famous cartoon character says "too

5   late."

6           MR. SPIVA:  Understood, Your Honor.

7           THE COURT:  Remember, I have to read all of this

8   stuff and think about it.

9           MR. SPIVA:  If we had them earlier --

10          THE COURT:  Never mind.  Just go on to whatever you

11  want to say on the merits and let's be done with it.

12          MR. SPIVA: I think that I can be brief, Your Honor,

13  that I think the major contention, I think, about the factual

14  scenario here misunderstands the point that was made by the

15  2015 and 2016 alerts, if you will, that some voters were

16  misassigned.  It wasn't to contend, because certainly we

17  didn't have the discovery to know this as a fact that it was

18  the same voters, but as the documents reflect, there were some

19  voters, the minutes of their board meetings reflect this.

20  There were some voters who were misassigned at the time and

21  that had to be corrected.

22          That should have set off some type of alarm bell.

23  It happened twice, at least twice.  To do some further

24  looking.  Maybe perhaps of the nature of the looking that

25  happened after this election.  That only took a couple of days

1   to discover that 347 people had been misassigned.  There

2   weren't adequate procedures certainly at the local level and

3   that's where, you know according to the Cortes declaration,

4   that's where the information comes from to begin with, the

5   assignments.

6          They go -- they then get put into the state system

7   and there wasn't really much procedure to speak of at the

8   state level either, Your Honor, because essentially the

9   Department of Elections only provided assistance when

10  requested by the localities.  And that, of course, resulted in

11  the number of people here that were disenfranchised.

12         The only other thing I will say, Your Honor, we

13  heard a lot, I think, from the gentlemen who spoke earlier.

14  And I need -- I have a cheat sheet, but I don't have an

15  attorney cheat sheet, so one of my distinguished colleagues on

16  the other side, talked about the fact that this was a small

17  number or small percentage when you compare it to everybody on

18  the voter rolls.  Of course here, where you have first of all,

19  about 11,000-some voters for each candidate, this is actually

20  a quite substantial number and of course when you compare it

21  to the margin, it could have made all the difference.  So it's

22  quite -- it's quite significant, Your Honor.

23         I don't really have much quarrel with my

24  distinguished colleague's description of the cases that I

25  cited.  I think though that they confirmed that in each of

1  those cases, *Griffin* and *Ury* and Kaiser [sic] that these were

2  inadvertent errors that resulted -- *Krieger* -- pardon me, Your

3  Honor, these were inadvertent errors that resulted in a

4  fundamental unfairness that the Court then decided that it had

5  to step in and correct with the new election.

6      I'll close with this, Your Honor.  You know, earlier

7  this week, a different client of mine in a different district.

8  I'm sorry, Your Honor, I should address one more thing,

9  because my distinguished colleague mentioned another case --

10  that case did not involve the issues in this case.  They

11  involved absentee ballots that were stuck at the post office.

12  And so I didn't want Your Honor left with the impression that

13  we had filed two cases in front of two different judges or

14  something like that involving the same issues.  That's not the

15  case.

16      Going back to my closing point, Your Honor.  You

17  know in another district that ultimately was decided with a

18  drawing -- I'm sure Your Honor has read about it -- although

19  the Court in that case ruled against our client, you know, I

20  was -- I found it quite moving that the Court noted that, you

21  know, one vote, that there's been a heavy price paid for the

22  right to vote.  And that the Court would do everything it

23  could to make sure that the will of the voters was heard.  And

24  here, too, Your Honor, you have in front of you 87 people who

25  have been denied their right to participate in the election,

1   in the *Wesberry v. Sanders* words of the representatives who

2   make the laws under which they must live.  And so, Your Honor,

3   should not seat someone who is not clear as the choice of the

4   voters.

5           Your Honor, we would respectfully request that you

6   require/order a new election.

7           THE COURT:  All right.  I'm going to recess briefly,

8   consider the matter, and I'll let you have a decision shortly.

9           (Recess.)

10          THE COURT:  All right.  The matter is before the

11  Court on a motion for a preliminary injunction.  And let me

12  say as a preface that I appreciate all of the arguments and

13  the briefs.  I have some -- I get a little bit irritated when

14  things come in at the last minute, but you can understand

15  that.  On the other hand, I am fully aware of how important

16  people think this is.  All the litigants that appear before me

17  think their case is very important.  Whether it's an

18  individual litigant in some civil case or a defendant.  The

19  case right before this was a young man looking at 32 years.  I

20  don't have any doubt that he thought that was pretty

21  important.  But, of course, I know that this is very important

22  to the people in these districts in Fredericksburg.  I'm quite

23  aware of that.  I simply say that every case that I hear is

24  important to the litigants involved.

25          I understand that.  That doesn't diminish in any way

1  how important I think it is to you all.  But by the same token

2  the fact that there are 50 people here doesn't move me.  I

3  know it's important.

4           Now the matter is before the Court on this motion

5  for a preliminary injunction and the plaintiffs are four

6  residents of Virginia House District 28 and they brought this

7  suit claiming that their First and Fourteenth Amendment rights

8  were infringed when poll workers mistakenly gave ballots for

9  HD-88 to residents of HD-28 at the General Election in

10 Virginia on November the 7th of this year -- of last year.

11 Time flies.  And it flies a lot more quickly at my age.  I

12 don't look back or forward anymore.  I only reminisce.

13          Plaintiffs now seek a preliminary injunction

14 ordering the officers of the Virginia State Board of Elections

15 to vacate certification results for HD-28 barring the clerk of

16 the House of Delegates from seating the winner, the certified

17 winner of HD-28 and ordering a new election for HD-28.

18          All of the plaintiffs are -- well plaintiffs are all

19 registered voters and residents of HD-28 in Virginia.  Each of

20 the plaintiffs voted in the November 7th General Election on

21 election day.  Three of the plaintiffs, Kenneth Lecky, Delores

22 Lecky, and Phillip Ridderhof were given ballots for HD-88

23 despite being residents of HD-28.  Amy Ridderhof successfully

24 voted in HD-28.

25          Defendants include a plethora of organizations and

individuals, but they include the Virginia State Board of
Elections, which regulates Virginia elections and certifies
the results of those elections.  The Virginia Department of
Elections, which implements election laws and regulations to
support accurate, fair, and open secure elections.  Stafford
County Electoral Board which prepares ballot, administers
absentee voting, conducts elections, ascertains results of
elections in Stafford County, the City of Fredericksburg
Electoral Board, which prepares ballots, administers absentee
voting, conducts elections, ascertains results of elections in
the City of Fredericksburg.

Now the individual defendants are sued in their
official capacities and they include the members of the State
Board.  Messrs. Alcorn, McAllister, and Ms. Wheeler.  Edgardo
Cortes, Commissioner of the Department of the Virginia
Department of Elections, and there's a list of others.
Completed with Mr. Nardo, clerk of the House of Delegates.  I
heard from his representative today.  And the form -- well, it
is still the governor of Virginia, Governor McAuliffe is also
named.

Now a brief summary of the voting procedures adds
necessary context to the Court's analysis and ruling.  Voting
assignments in Virginia track the U.S. Census.  Following
publication of a census a general assembly redraws districts
and assigns localities to each district based on federal and

1  constitutional restrictions.

2          Precincts may be wholly within a particular district

3  or split to include voters -- to include voters from multiple

4  districts.  Precincts, of course, are entities established by

5  localities.  After new districts are finalized, 133 general

6  registrars across Virginia manually assign addresses to

7  districts in the Virginia Election and Registration

8  Information System.  It's called VERIS, a statewide database

9  which contains voting data.  And because road addresses do not

10  follow locality and precinct boundaries used in the census,

11  this process of assigning addresses to particular districts is

12  not without significant complexity.  Post office

13  accommodations, homeowner petitions, and changes to street

14  names further or can further complicate the process.  People

15  can ask:  I don't like my number.  Can I change my number?

16  Can I put my post office box on the other side of the road?

17  All of those things may operate to complicate things.

18          When an election occurs, the State Board provides

19  VERIS data to polling locations so that poll workers can

20  distribute the correct ballots to individual voters.

21          Now on April 11th -- I'm sorry, April 2011,

22  following the 2010 Census, the General Assembly completed

23  redistricting of all 100 House of Delegates seats.  The

24  resulting district map split Stafford County in the City of

25  Fredericksburg between HD-28 and HD-88.  Stafford County also

1   contained precincts within HD-2.

2          Specifically using the precincts in existence, as of

3   April 1, 2011, the General Assembly assigned 12 full precincts

4   and part of another precinct in Stafford County and two full

5   precincts and a part of another precinct in the City of

6   Fredericksburg.  That's part of the Virginia code.  And

7   general registrars statewide then updated the addresses

8   assigned to each district in VERIS accounting for changes to

9   the boundaries.

10         Several months after 2011 redistricting, the City of

11  Fredericksburg redrew its precinct lines and as a result

12  several precincts not formally split between HD-28 and HD-88

13  became split between the Districts, meaning the voters in the

14  same precinct were located in different House Districts.

15  Different voters of the voting place would have different

16  ballots from voters voting in the polling booths next to them

17  depending on -- depending not on current precinct lines, but

18  on what the precinct lines were previously in the 2010 Census

19  report.

20         Now the General Election for the House of Delegates

21  occurred, as I said, on November 7, and on that day the

22  plaintiffs went to their respective polling locations to

23  attempt to vote in the HD-28 race between Cole and Thomas.

24  And as I said, Amy Ridderhof successfully voted in HD-28.

25  Phillip Ridderhof, despite being correctly assigned in the

1    VERIS database as the voter in HD-28, received a ballot for

2    HD-88 due to a poll worker's error.  Kenneth Lecky and D.D.

3    Lecky were given ballots for HD-88 because the VERIS database

4    incorrectly reflected their addresses as falling within HD-88

5    and not HD-28.

6          When poll workers gave Lecky a ballot for HD-88, she

7    told the poll workers she believed she should have been

8    assigned or she should have been registered to vote in HD-28.

9    And after she voted, Lecky raised her concern again to two

10    board members, Rodriguez and Markel, who directed her to the

11    map of the House District.  When the map suggested that she

12    had been assigned to the wrong district, the board members

13    determined that the map was incorrect and removed it from the

14    polling place.  In other words, they elected to rely on the

15    VERIS data.  The election official also denied provisional

16    ballots to the affected voters on the day of the election

17    based on their determination that the VERIS database was

18    entitled to a presumption of validity.  And if the database

19    were incorrect, the voters could pursue state mechanisms to

20    challenge it.

21          I'll have something more to say about provisional

22    ballots in a moment.

23          So, the complaints prompted the Department to

24    investigate the reasons for and the extent of the

25    irregularities and on November 27th, the Department issued a

1  summary of the findings of the investigation.  And these

2  findings included that 260 voters were incorrectly listed in

3  the VERIS database as residing in HD-2 or HD-88 rather than

4  HD-28.  But only 86 of the 260 voted in the November 7

5  election.  124 voters who were not residents of HD-28 were

6  incorrectly listed as residents of HD-28.  And 61 of these 124

7  voted in the November 7 election.  Of course, we don't know

8  how they voted.

9        So in total, a number 300 were -- and some, were

10  incorrectly listed in the VERIS database.  147 of those of

11  whom voted.  The State Board certified the results of the

12  election in HD-28 with Thomas receiving 11,842 votes and Cole

13  receiving 11,760, a margin of victory of 82 votes.

14        A later recount requested by the losing candidate

15  Cole confirmed that Thomas was the winner of the election but

16  by reduced margin of victory of 73 votes.  Then plaintiff

17  brought this suit, pursuant to Section 1983 alleging

18  violations of their First and Fourteenth Amendment rights and

19  seeking a temporary restraining order to enjoin the Department

20  from certifying the results of the HD-28 election.

21        And I held a hearing on December 6, 2017, after a

22  hearing the request for a TRO was denied for the reasons I

23  stated then and there's an order as well.  And I also noted

24  thereafter, I issued an order to show cause why the complaint

25  should not be dismissed as being moot because the only -- the

1   only remedy sought was related to the -- what was in the TRO.

2   But, of course, I gave the plaintiffs leave to file an amended

3   complaint, which they did.  And filing today or -- the motion

4   for a preliminary injunction, which I am reviewing today and

5   ruling on today.

6           And the amended complaint alleges that the errors in

7   House District assignments were the result of "defendants

8   employing inadequate safeguards, including allocating

9   insufficient resources against erroneous deprivations of the

10  right to vote."

11          The amended complaint further alleges that the --

12  that administrators of this election knew or had reason to

13  know that significant numbers of registered voters were

14  incorrectly assigned to House Districts well before the 2017

15  election.  There's some detail there that I don't think I need

16  to go into, but.  And the allegation is that other election

17  officials in Fredericksburg and the Department knew about the

18  incorrect assignments no later than 11 a.m. on election day.

19  So the amended complaint says there's a denial of the right to

20  vote in violation of substantive due process, a denial of the

21  right to vote in violation of procedural due process, undue

22  burden on the right to vote in violation of the First

23  Amendment and the equal protection clause of the Fourteenth

24  Amendment and disparate treatment of voters in violation of

25  the equal protection clause and simply disparate treatment.

1    Well, the standard for issuance of preliminary

2 injunction is too well settled to require extended discussion.

3 A party seeking a preliminary injunction must demonstrate that

4 that party is likely to succeed on the merits, that that party

5 is likely to suffer irreparable harm in the absence of

6 preliminary relief, and that the balance of equities tips in

7 that party's favor, and that an injunction is in the public

8 interest.

9    Now the *Winter* case in the Supreme Court is the best

10 authority for that.  And if you're as old as I am you know

11 that *Winter* altered long-standing Virginia law that went back

12 to, at least the '60s.  Making the standard a little more

13 rigorous.  No sliding scales or anything of that sort.

14    So the Fourth Circuit has, in applying *Winter*, made

15 clear that the movement -- I'm sorry, that the movant need not

16 show a certainty of success, but the movant must make a,

17 quote, clear showing, closed quotes, of likelihood of success

18 on the merits.  And that's from the *Pashby* case at 709 F.3d.

19    So we begin with an analysis of the various factors

20 to be considered for a preliminary injunction.  We begin with

21 whether the plaintiffs have made a requisite clear showing of

22 likely success on the merits.

23    Now the Supreme Court has made clear that the first

24 inquiry in any suit under 1983 is whether the plaintiff has

25 been deprived of the rights secured by the constitution and

1  the laws.  And in the context of state or local election

2  irregularities, the Fourth Circuit has also made clear that

3  whether the irregularity amounts to a constitutional claim,

4  depends on its severity, whether it was intentional or more of

5  a negligent failure to carry out properly state election

6  procedures and whether it erodes a democratic process.  That's

7  from the *Hendon* case, which we've heard reference to tonight,

8  and I'll say more about in a minute.

9       Importantly, Fourth Circuit precedent also requires

10  courts considering these claims to pay mind to the functional

11  structure embodied in the Constitution.  The nature of the

12  federal court system and the limitations inherent in the

13  concepts of both -- the concepts both of limited federal

14  jurisdiction and the remedy afforded.

15       In other words, it is important for federal courts

16  to be exquisitely sensitive to interfering in state matters.

17  I think I've stated that a little too broadly.  But

18  essentially it means that federal courts should be very

19  sensitive to that.

20       Now the plaintiffs in this case argue they were

21  denied their right to vote in HD-28 or had their votes diluted

22  in violation of the due process or equal protection clauses of

23  the Fourteenth Amendment.

24       As an initial matter, it's not entirely clear

25  whether there is a federal constitutional right to vote in a

1  particular district.  The districts are assigned by the

2  General Assembly and federal law appears to be essentially

3  agnostic on the question of which ballot a voter is given.

4  But with that said, the Supreme Court has also made clear that

5  a citizen has a constitutionally protected right to

6  participate in elections on an equal basis with other citizens

7  in the jurisdiction.

8          So I'm going to proceed on the assumption that there

9  is a constitutional right that is involved -- that could be

10  involved in voting in a particular district.  That doesn't

11  mean I have decided this matter by any means.

12         Now with respect to the plaintiffs' substantive due

13  process claims or arguments, courts in this circuit and

14  elsewhere have uniformly distinguished between patent or

15  patent and fundamental and broad-gauged unfairness that erodes

16  the democratic process and garden-variety election

17  irregularities that do not give rise to a due process claim

18  under Section 1983.  Numerous cases so hold, including

19  *Hutchinson*, which we've discussed here this evening.

20         So if we look at the cases, it's not surprising that

21  one side or the other picks cases that they believe reflect

22  something close to what happened and either characterizes it

23  as broad-gauged or not.  So if we look at that, the *Griffin*

24  case points out that cases justifying federal intervention

25  have involved attacks upon the fairness of the official terms

1    and procedures under which elections were conducted and have

2    not required the federal court to enter into the details of

3    the administration of the election.

4         Specifically, courts have found that the total

5    abrogation of a statutorily mandated special election --

6    that's the *Welch* case in the Fifth Circuit -- the widespread

7    retroactive invalidation of the absentee and shut-in ballots

8    cast by voters relying on official inducements -- that's the

9    *Griffin* case -- the systematic lack of uniform rules and

10   standards and procedures leading to failures in registration,

11   voting machine allocation, and poll worker training over the

12   course of 30 years and several elections -- that's all the

13   *League of Women Voters* against *Brunner* -- and last minute

14   consolidation of precincts resulting in hours long waiting

15   times all -- that resulted in large numbers of people not

16   being able to vote at all, all amount to the kind of

17   broad-gauged unfairness that renders an election patently and

18   fundamentally unfair.

19        Now, on the other hand, the inaccurate tabulation of

20   votes stemming from malfunctioning electronic voting devices

21   -- that's the *Shannon* case and the *Hennings* against *Grafton*

22   case and the *White-Battle* case -- the dilution of illegal

23   votes caused by election officials permitting non-democrats to

24   vote in a democratic primary -- that's the *Powell* case in the

25   Second Circuit -- the mistaken use of wrong district map in

assigning voters -- that's the -- that's the *Harris City Department of Education* against *Harris City, Texas* -- and the inadvertent printing of ballots that fail to comply with the statutory requirement -- that's the *Hendon* case -- have all been deemed to be garden-variety irregularities insufficient to state a due process claim.

In my view, and I recognize that it's a judgment. This will come as no surprise to all of you, that's what I do. That's what judges do. They make judgments.

In my judgment, plaintiffs have not made the requisite clear showing that the assignment of voters to incorrect House Districts and the distribution of ballots associated with those incorrect House Districts amounts to the kind of broad-gauged unfairness necessary to state a due process claim.

Rather, as in the *Shannon*, *Hennings*, *Powell*, *Harris* and *Hendon* cases, the allegations in the amended complaint attribute those election or these election irregularities largely to innocent human or mechanical error in entering the addresses assigned to each precinct and at most negligence on the part of election officials in failing to take steps to correct those errors. So that's important what I've just said. What I've just said is I think that at most -- at most there -- there are some negligent errors in failing to make these corrections.

1    I don't think there is any evidence or claim that

2  there was any great conspiracy to dilute these votes in HD-28

3  or to do anything else nefarious.  Certainly no evidence of

4  that is shown.  Some evidence was adduced last night that

5  these things were talked about.  And today I heard from a

6  response saying they aren't the same as the issues that are

7  being raised today.  I'm not entirely clear.  I'm going to

8  look more closely at that, because I'm going to write an

9  opinion about this, but I don't see that as the same.  I think

10  these officials acted reasonably in these circumstances.  I'll

11  say more about that in a minute.  That doesn't mean that I

12  think they reached the right result.  But I think they acted

13  reasonably and without any intent or discriminatory animus or

14  anything else.

15    (Discussion off the record.)

16    THE COURT:  Now I think the -- as in *Shannon*,

17  *Hennings, Powell*, *Harris*, and *Hendon* the allegations in the

18  amended complaint, I think, attribute the election

19  irregularities, I think here, largely to innocent human or

20  mechanical error in entering the addresses assigned to each

21  precinct or negligence on the part of election officials in

22  failing to take prompt steps to correct those errors.

23    Now the election officials' failure to offer

24  provisional ballots to affected voters on election day, in my

25  view, does not arise to a due process violation.

1    If you think about it a minute, the statute on

2  provisional ballots you have to show up and you have to file

3  an affidavit that says you're entitled to vote in that

4  district and then you get only one ballot.  What you can't do

5  is give ballots for somebody in HD-28 and then they get a

6  ballot in HD-88 and they go and vote.  Because you can't ever

7  count -- you can't ever keep them out.  There might be a way

8  to do it, but I think the officials in these circumstances

9  made a reasonable decision to rely on the data that they had,

10  the VERIS data that they had, in their determinations.  And I

11  don't find that is sufficient to trigger the broad-gauged,

12  patent, and fundamental unfairness that erodes the democratic

13  process, that would be -- that would be necessary to state a

14  due process claim.

15    Now in *Hendon* plaintiff voters brought equal

16  protection and due process claims alleging that their right to

17  vote was violated when the ballots in the General Election

18  failed to comply with the technical requirements of a North

19  Carolina statute.  Although the Fourth Circuit acknowledged

20  the failure of the ballots to comply fully with statutory

21  requirements, the Fourth Circuit there found that that failure

22  does not constitute a violation of the due process clause,

23  because there's no indication that the failure was other than

24  simple negligence on the part of election officials.

25    So, as in *Hendon*, even assuming the failure of

1   election officials to provide provisional ballots, which I

2   don't think was a violation of Virginia law, but I think that

3   there is no persuasive indication or evidence that the failure

4   was other than simple negligence on the part of election

5   officials.

6           So in sum, because allegations suggest that the

7   errors were, in my view, no more than garden-variety

8   irregularities, that doesn't mean that it isn't important to

9   those people whose votes should have been counted in HD-28 or

10  HD-88 and were not that it's not a big deal to them.  Of

11  course I understand it's a big deal.  But it's -- there are

12  other big deals here like federal courts sticking their noses

13  into state election procedures, which may have to happen.  If

14  I go on and hear this case and I hear more evidence and I make

15  appropriate findings, I could order a new election.  But it's

16  going to take much, much more than I've seen before today.

17  And I indicated that during the TRO.  I think to some extent

18  the plaintiffs recognized that I am not an enthusiastic -- not

19  enthusiastic about interfering in state elections and that I

20  hope the General Assembly would take care of it.  Well, that

21  wasn't a path that was chosen.  And I understand that.  Who

22  knows what I would have done if I had been a lawyer in this

23  case.  I might have made the same choice.

24          But in any event, I did make my preference for state

25  remedy for this problem known.  In any event, as I said the

allegations here and the evidence that has been presented

suggest the errors here were no more than garden-variety

irregularities and I don't believe the plaintiffs have made

the requisite clear showing of likely success on their

substantive due process claim.

The procedural due process claim or argument

similarly fails.  Put simply, the plaintiffs have failed to

allege as sufficiently constitutionally protected a sufficient

constitutionally protected interest.  For example, in the

*Brunner* case, the Sixth Circuit considered a similar

procedural due process claim, namely the -- that failures of

election procedures deprive voters of their liberty interest

in voting without adequate pre or post deprivation process.

The *Brunner* court recognized that even though the

voting system in that case impinged on fundamental right to

vote, plaintiffs nonetheless had failed to allege a

constitutionally protected interest.  The plaintiffs here

point to no authority actually supporting the existence of a

procedural due process claim.  Indeed, the only voting case

they cite in this section of their brief, *Bush* against *Gore*

and *Hunter* against *Hamilton City* involved a substantive due

process, an equal protection claim, not a procedural due

process claim.  So in my view, the plaintiffs here have not

made the requisite clear showing that they're likely to

succeed on the merits of their procedural due process claim.

1          Now finally, with respect -- well not quite finally.

2    Let me mention, there was something said about the *Krieger*

3    case.  That was a case in which two rounds of ballots were

4    misprinted and a third correct ballot was sent out even though

5    the state election officials decided to count the first two

6    sets of ballots or first set of ballots where one of the

7    candidates was not even identified.  The Court determined that

8    this was a broad-gauged unfairness because the election

9    officials made the decision to count hundreds of ballots that

10   did not list all of the qualified candidates.  In my view

11   that's very different from this case.

12          In addition, also cited in the course of argument,

13   was the *Bennett* case.  This falls on the other side.  There

14   the Ninth Circuit held that a Hawaii Supreme Court

15   interpretation of a state law resulting in the counting of an

16   additional 45,000 ballots as cast ballots within the meaning

17   of the state constitution was not a fundamentally unfair

18   abridgment of the right to vote.  Although, the state election

19   commission had informed voters before the election that

20   abstention ballots -- and that's what happened, they didn't

21   put in their vote, they just left it blank -- that abstention

22   ballots would not count towards the total number of ballots

23   cast, that fact did not persuade the Ninth Circuit that the

24   Hawaii Supreme Court had violated the substantive due process

25   rights of Hawaii voters by choosing to interpret the Hawaii

1  Constitution differently.

2        So importantly, the Ninth Circuit noted that the

3  state -- the states have the right to determine their own

4  election rules.  And that's true here as well.  There's

5  actually a good deal more law about that that I don't have the

6  time to get into, but I do think it's important to reference

7  that.

8        In the -- so let me proceed.  I think the plaintiffs

9  have failed to make a clear showing of likelihood of success

10 on the merits with respect to their equal protection claims.

11 They argue that *Anderson-Burdick* framework applies.  And under

12 that framework any interest in Virginia, any interest Virginia

13 might have in differentiating between the residents of HD-28

14 does not outweigh the severe deprivation associated with a

15 denial of the right to vote.  But it's not clear that

16 *Anderson-Burdick* line of cases even applies here.  In fact, I

17 don't believe it does.

18       In *Anderson-Burdick* and their progeny courts have

19 considered the constitutionality of state statutes,

20 regulations, or policies that burden the right to vote, not

21 accidental mistakes on the part of election officials in

22 administering an election.  To hold otherwise would

23 effectively transform any inadvertent error in the

24 administration of state elections into a federal equal

25 protection violation and I don't think the law supports such a

1  conclusion.

2       Here the plaintiffs do not allege that the incorrect

3  assignments of voters was the result of a state policy or a

4  state regulation or statute.  Rather, plaintiffs identified a

5  series of mistakes and corresponding failures to take

6  corrective action.  And there was, I think, this late admitted

7  evidence that was brought to my attention is meant to show

8  that it was ongoing for a long time.  But I heard today, from

9  one of the advocates, that those are different.  Of course I

10 will look more carefully at that in the future, but for now

11 I'm not persuaded.  The only policy plaintiffs identify is the

12 local election officials' decision not to provide provisional

13 ballots to voters who identified themselves as assigned to the

14 incorrect district on election day.  And they say allegedly

15 that's in violation of Virginia law.  I don't agree with that

16 being in violation of Virginia law.

17      I think if we look at the text of Virginia Code

18 24.2-653A -- I think what the statute is focussing on is on

19 people who are not permitted to vote because they don't appear

20 to be registered and they file an affidavit, they're given a

21 provisional ballot.  As I said the problem with someone who

22 says that I'm supposed to vote in HD-28, you've given me a

23 vote -- a ballot for HD-88, that can't be remedied on the spot

24 with a provisional ballot.  I suppose what could have happened

25 -- but there's no precedent for it -- is that they could have

1  given someone both ballots, put them away, figured out the

2  right, and then counted them.  They could have done that.  I

3  don't believe the federal constitution requires that.  I think

4  they were reasonable in relying on VERIS as it existed.

5       Now so the Seventh Circuit in *Hennings* considered a

6  similar claim, namely the failure of election officials to

7  provide substitute paper ballots when voting machines

8  malfunctioned in violation of state law.  They said that was a

9  violation of state law.  That wasn't sufficient to raise an

10  equal protection claim because the mere violation of a state

11  statute by an election official will not give rise to a

12  constitutional claim and an action under Section 1983.  That

13  is *Hennings* quoting *Snowden* against *Hughes* in the Supreme

14  Court.

15       So in my view, at this point, plaintiffs have not

16  made clear that the *Anderson-Burdick* framework applies here.

17  Plaintiffs also allege that election officials violated the

18  equal protection clause by providing some HD-28 voters with

19  correct ballots and others with incorrect ballots.  Plaintiffs

20  contend that this disparate treatment of voters living in the

21  same district was arbitrary and thus amounts to an equal

22  protection violation.

23       And the Supreme Court has noted that generally

24  uneven or erroneous application of an otherwise valid statute

25  may constitute denial of equal protection, but only if it

1 represents intentional or purposeful discrimination.  That's

2 the *Snowden* case in 321 U.S.

3        Importantly, in the voting contest, the Supreme

4 Court has more recently recognized that arbitrary treatment in

5 some circumstances can also result in equal protection

6 violation, even where it is not intentionally discriminatory.

7 That's *Bush* against *Gore*, which once it was issued was said

8 don't rely on this for anything in the future.

9        Neither of these factors, neither arbitrary or

10 intentional discrimination, exists here.  To begin with, as

11 I've mentioned before, the amended complaint contains no

12 allegations nor has any evidence been presented that any

13 individual or that any invidious or intentional discriminatory

14 behavior exists on the part of the election officials.

15        At most, the amended complaint discloses negligence

16 on the part of registrar employees in entering information and

17 negligence on the part -- perhaps on the part of election

18 officials in failing to correct mistakes once they became

19 aware of them.

20        In *Gamza*, an error in setting up matrices on voting

21 machines meant that many votes for one candidate were

22 erroneously assigned to a different candidate.  There, the

23 Fifth Circuit concluded that the error did not constitute

24 denial of equal protection of the laws because there was no

25 evidence that the initial error in setting up the matrices and

the subsequent miscount of the ballots resulted from anything

other than entirely innocent human error.  Now that's *Gamza* at

619 F.2d at 452.

Nor, in my view, have plaintiffs made a clear

showing that the election officials subjected voters to

arbitrary distinctions.  Courts have generally found equal

protection violations where a lack of uniform standards and

procedures results in arbitrary and disparate treatment of

different voters.  *Bush* against *Gore*, for example, in the

recounts.  Similarly the Sixth Circuit in *Brunner* found that

the facts in the complaint adequately alleged an equal

protection violation because nonuniform rules, standards, and

procedures for elections in Ohio had resulted in massive

disenfranchisement and unreasonable dilution of the vote,

depending on a voter's residence.

So by contrast, that's -- this case is quite

different.  The amended complaint here does not allege that a

lack of uniform or specific standards and procedures

contributed to the erroneous assignment of voters to House

Districts.  Instead, the complaint alleges that the election

irregularities resulted from mere human error in failing to

assign addresses to the right location and negligent in

failing to correct fully the errors once election officials

learned of the possibility of incorrect assignments.

Plaintiffs do not argue that the procedures for

1   assigning localities are not uniform or that the voters were

2   treated differently once they informed poll workers that they

3   believed themselves assigned to a different district.  So,

4   it's far from clear that plaintiffs are likely to succeed on

5   their claim that state officials imposed distinctions so

6   arbitrary as to amount to equal protection violations.

7           Now with respect to the issue of irreparable harm,

8   plaintiffs essentially contend that any deprivation of a

9   constitutional right automatically constitutes irreparable

10  harm.  This ignores an important part of the analysis courts

11  must conduct.  And let me be clear, having found that there's

12  not a clear showing of success on the merits, there is no

13  obligation to go on to the other factors.  But I do so anyway.

14  You spilled a lot of ink and so I'm going to do it.

15          As I've said, any deprivation of a constitutional

16  right automatically constitutes irreparable harm ignores an

17  important part of the analysis the Courts must conduct in

18  considering whether to grant a preliminary injunction.

19  Namely, whether a party is likely to suffer irreparable harm.

20  In this case, assuming these plaintiffs were denied the right

21  to vote in HD-28 in the November 7th, '11 -- November 7th

22  election, that irreparable harm has already occurred.  The

23  important question is thus whether additional irreparable

24  harm, if preliminary relief is not granted, occurs.  And their

25  reply in support of their motion for preliminary injunction,

1  plaintiffs suggest that important House of Delegates business

2  takes place in the first month of a session.

3          Yes, I won't quarrel with that.  I suppose some

4  people might quarrel with the notion that important work takes

5  place there.  Brings back memories.  Back in the late '60s,

6  early '70s I participated in trying to get a bunch of law

7  changes for the procedural code and so I appeared numerous

8  times, worked with committees, and worked with changing the

9  statute and the most I can say that if you're going to be a

10 legislator you should have very, very long patience.  And

11 you've got to be prepared to tolerate a lot of foolishness.

12          In any event, that's irrelevant.

13          So in their reply brief, as I pointed out,

14 plaintiffs suggest that the House of Delegates business in the

15 first few weeks is very important.  And I take that point.

16 That's a fair point.  Namely, the Speaker is chosen and

17 committee assignments are selected.

18          Plaintiffs allege that this process affects many of

19 the bills and will be considered in the session in how votes

20 occur and suggests that this -- that this cannot later be

21 repaired.  But at the same time, Thomas can be removed from

22 his office if a new election is ordered and if Joshua Cole

23 prevails.

24          As such, some of the harm can later be remedied.

25 Not all of it.  I think there is some -- some strength to the

1   claim that there is irreparable harm.  But as I said, that

2   becomes irrelevant if there's no clear showing of likelihood

3   of success on the merits.

4          Next is the balance of equities whether the public

5   interest weighs in favor of plaintiff -- plaintiffs.  To be

6   sure, the right of suffrage is a fundamental matter.  No doubt

7   about that.  But the Fourth Circuit has emphasized the

8   importance of considering, in these cases, the functional

9   structure embodied in the constitution, the nature of the

10  federal court systems, and the limitations inherent in the

11  concepts of both limited federal jurisdiction, and of the

12  remedy afforded by Section 1983.  That is, as I mentioned, is

13  from *Hutchinson* and *Gamza*.

14         In this case, the structure of the constitution and

15  the nature of the federal court system weigh somewhat in favor

16  of the defendants.  As the Fourth Circuit recognized in

17  *Hutchinson*, which is a case more -- which is a case that has

18  been much discussed here -- the constitution anticipates --

19  this is *Hutchinson* -- anticipates that the electoral process

20  is to be largely controlled by the states and reviewed by the

21  legislature.  And the Supreme Court has made clear that the

22  states undoubtedly retained primary authority to regulate the

23  elections of their own officials.  That goes back almost a

24  century.

25         Virginia here has done its job of ensuring due

1   process by providing numerous avenues by which to challenge

2   election results, including recounts and election contests in

3   the House of Delegates and others.  Intervention of a federal

4   court into the details of this election would be, on this

5   record, would be inconsistent with proper respect for the role

6   of others whose job it is to canvass the returns and declare

7   the prevailing party.  And the granting of an injunction might

8   also provide incentives for candidates and voters to ignore

9   principal roots established to challenge an election.

10          The Supreme Court has noted that federal voiding of

11  a state election is "drastic."  That's the word in *Bell*

12  against *Southwell* is "drastic" if not staggering remedy.  And

13  as such it is a form of relief to be guardedly exercised.

14          So a federal court must exercise caution before

15  interfering in a state election, particularly on a threshold

16  motion before all facts have been developed.  Although a great

17  many have been developed.

18          So, in conclusion, plaintiffs have not made a clear

19  showing that they are likely to success on the merits of their

20  claims under the due process or equal protection clause, nor

21  have they shown that the balance of hardships and public

22  interest favor an injunction.  So I'm denying the motion for a

23  preliminary injunction.

24          But having said that, let me be clear, if the facts

25  were different I wouldn't hesitate to call for a new election.

1　If there were large groups of people, obviously if they were

2　denied the right to vote because of their ethnicity or for

3　some other reason, that would fall on the other side of the

4　*Hutchinson* line.  But in this case, I come back to saying that

5　it's my judgment at this time, on this record, that there is

6　no clear showing of likelihood of success on the merits to

7　warrant a preliminary injunction.  And I say that fully

8　cognizant of the argument made by the plaintiffs that

9　important things happen in the early part of the General

10　Assembly.

11　　　　Now having denied the motion for a preliminary

12　injunction, the next thing that ought to happen in this

13　litigation is parties ought to file their motions to dismiss,

14　if you intend to.  We have a lot of defendants in this case

15　that I think perhaps have no business in the case.  But I may

16　be wrong.  And I'm prepared to reconsider that, but I want

17　motions to dismiss, if you feel your client is entitled to

18　one, to be filed promptly.  And so that we can resolve that

19　and determine whether this case goes on or not.  I will issue

20　an opinion that sets out what I have said tonight and more.

21　So the parties will have that.

22　　　　Now I appreciate your patience.  I know that my

23　ruling is disappointing to a large number of you, but the one

24　thing you -- I hope you cannot be disappointed is I have not

25　ignored your claims.  I have not failed to pay attention to

1   them and failed to consider the authorities you've cited.

2   That doesn't mean I know I'm right.  What it means is I've

3   done the best I could and I think I'm right and that's what I

4   do.

5           And I also want to thank counsel for your briefs and

6   your arguments.  They were helpful and interesting.  There's

7   not a lot of law in this area of this kind of irregularity,

8   this kind of situation.  But I think this case will be helpful

9   to voting officials around Virginia to make sure they have

10  things as up-to-date and as correct as they can.

11          Thank you for your patience.  Court stands in recess

12  until Monday.

13

14          **(Proceedings adjourned at 7:49 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1   <u>CERTIFICATE OF REPORTER</u>

2

3

4         I, Tonia Harris, an Official Court Reporter for

5   the Eastern District of Virginia, do hereby certify that I

6   reported by machine shorthand, in my official capacity, the

7   proceedings had and testimony adduced upon the Motion for

8   Preliminary Injunction in the case of the **KENNETH J. LECKY,**

9   **et al versus VIRGINIA STATE BOARD of ELECTIONS, et al,**

10  Criminal Action Number 1:17-CV-1336, in said court on the

11  5th day of January, 2018.

12        I further certify that the foregoing 74 pages

13  constitute the official transcript of said proceedings, as

14  taken from my machine shorthand notes, my computer realtime

15  display, together with the backup tape recording of said

16  proceedings to the best of my ability.

17        In witness whereof, I have hereto subscribed my

18  name, this the January 7, 2018.

19

20

21                              _____

22                              Tonia M. Harris, RPR
                                Official Court Reporter

23

24

25

                                                              74