IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KENNETH J. LECKY, *et al.*, )<br>    Plaintiffs, )<br>  )<br>    v. )<br>  )<br>VIRGINIA STATE BOARD OF )<br>ELECTIONS, *et al.*, )<br>    Defendants. ) | Case No. 1:17-cv-1336 |

## MEMORANDUM OPINION

This matter is before the Court on plaintiffs' Motion for a Preliminary Injunction (Doc. 36). Plaintiffs, four residents of Virginia House District 28 ("HD 28"), brought this suit claiming that their First and Fourteenth Amendment rights were infringed when poll workers mistakenly gave ballots for House District 88 ("HD 88") to residents of HD 28 at the general election in Virginia on November 7, 2017. Plaintiffs are now seeking a preliminary injunction ordering officers of the Virginia State Board of Elections to vacate the certification results for HD 28, barring the Clerk of the Virginia House of Delegates ("House of Delegates") from seating the winner of the HD 28 race, and ordering a new election for HD 28.

**I.**

Plaintiffs are all registered voters and residents of HD 28 in Virginia. Each of the plaintiffs voted in the November 7, 2017 general election in Virginia. On Election Day, three of the plaintiffs, Kenneth Lecky, Dolores ("D.D.") Lecky, and Phillip Ridderhof were given ballots for HD 88 despite being residents of HD 28. Amy Ridderhof successfully voted in HD 28.[1]

---

[1] Despite successfully voting in HD 28, Amy Ridderhof argues that her vote was diluted when HD 88 voters were mistakenly permitted to vote in HD 28.

1

Defendants include several organizations as well as individuals. The organizations include: the Virginia State Board of Elections ("State Board of Elections"), which regulates Virginia elections and certifies the results of those elections; the Virginia Department of Elections ("Department of Elections"), which implements election laws and regulations to support accurate fair, open, and secure elections; the Stafford County Electoral Board ("Stafford Board"), which prepares ballots, administers absentee voting, conducts elections, and ascertains results of elections in Stafford County; and the City of Fredericksburg Electoral Board ("Fredericksburg Board"), which prepares ballots, administers absentee voting, conducts elections, and ascertains results of elections in the City of Fredericksburg. The individual defendants, each sued in their official capacities, include James B. Alcorn, Clara Wheeler, and Singleton McAllister of the State Board of Elections; Edgardo Cortes, the Commissioner of the Department of Elections; Doug Filler, Marie Gozzi, and Gloria Chittum of the Stafford Board; Greg Riddlemoser, the General Registrar of Stafford County; Rene Rodriguez, Aaron Markel, and Cathie Fisher Braman of the Fredericksburg Board; Marc Hoffman, the General Registrar of the City of Fredericksburg; Robert Thomas, Jr. ("Thomas"), the certified winner of the HD 28 election; Paul Nardo, the Clerk of the House of Delegates; and Terry McAuliffe, the Governor of Virginia.

A brief summary of voting procedures in Virginia will provide necessary context for the events that occurred on November 7, 2017. Voting assignments in Virginia track the United States Census. Following the publication of a Census, the General Assembly redraws districts and assigns localities or precincts[2] to each district based on federal and constitutional restrictions. Precincts may be wholly within a particular district or split to include voters from

---

[2] Precincts are entities established by localities.

multiple districts. After new districts are finalized, the 133 General Registrars across Virginia manually assign addresses to districts in the Virginia Election & Registration Information System ("VERIS"), a statewide database which contains voting data. Because roads and addresses do not follow the locality and precinct boundaries used in the Census, this process of assigning addresses to particular districts is not without significant complexity. Post office accommodations, homeowner petitions, and changes to street names can further complicate this process. When an election occurs, the State Board of Elections provides VERIS data to polling locations so that poll workers can distribute the correct ballots to individual voters.

In April 2011, following the 2010 Census, the General Assembly completed redistricting of all 100 House of Delegates seats. The resulting district map split Stafford County and the City of Fredericksburg between HD 28 and HD 88.[3] Specifically, using the precincts in existence as of April 1, 2011,[4] the General Assembly assigned 12 full precincts and part of another precinct in Stafford County and two full precincts and part of another precinct in the City of Fredericksburg to HD 28. *See* Va. Code § 24.2-304.3. General Registrars statewide then updated the addresses assigned to each district in VERIS, accounting for changes to the boundaries.

Several months after the 2011 redistricting, the City of Fredericksburg redrew its precinct lines. As a result, several precincts not formerly split between HD 28 and HD 88 became split between the districts, meaning that voters in the same precinct were located in different house districts. Different voters at the polling place would have different ballots from voters in polling booths next to them depending not on the current precinct lines, but on the precinct lines that *were previously* in the 2010 Census reports.

---

[3] Stafford County also contained precincts within HD 2.
[4] *See* Va. Code. § 24.2-304.-3(C).

The general election for the House of Delegates occurred on Tuesday, November 7, 2017. On that day, plaintiffs all went to their respective polling locations to attempt to vote in the HD 28 race between Joshua Cole ("Cole") and Thomas. Amy Ridderhof successfully voted in HD 28. Phillip Ridderhof, despite being correctly assigned in the VERIS database as a voter in HD 28, received a ballot for HD 88 due to poll worker error. Kenneth Lecky and D.D. Lecky were given ballots for HD 88 because the VERIS database incorrectly reflected their addresses as falling within HD 88, and not HD 28. When poll workers gave D.D. Lecky a ballot for HD 88, she told the poll workers that she believed she should have been registered to vote in HD 28. After she voted, DD Lecky raised her concerns again to two Board Members, Rodriguez and Markel, who directed her to the map of HD 28. When the map suggested that she had been assigned to the wrong district, the Board Members determined, on the basis of the VERIS database, that the map was incorrect and removed it from the polling place. The election officials also denied provisional ballots to the affected voters on Election Day based on their determination that the VERIS database was entitled to a presumption of validity and that if the database were incorrect, state mechanisms could remedy the errors. Specifically, the Virginia Code allows an unsuccessful candidate in an election to request a recount of the votes cast in the election[5] or to contest the validity of the election in the General Assembly on the basis of objections to the conduct or results of the elections.[6]

Complaints prompted the Department of Elections to investigate the reasons for, and the extent of, any irregularities. On November 27, 2017, the Department of Elections issued a summary of the findings of the investigation, including:

---

[5] *See* Va. Code 24.2-802.
[6] *See* Va. Code 24.2-803.

- 260 voters were incorrectly listed in the VERIS database as residing in HD 2 or HD 88, rather than HD 28.
- 86 of those 260 individuals voted in the November 7 election.
- 124 voters who were not residents of HD 28 were incorrectly listed as residents of HD 28.
- 61 of those 124 individuals voted in the November 7 election.

Thus, in total, 384 voters were assigned to incorrect districts in the VERIS database, 147 of whom voted in the November 7, 2017 election.

Plaintiffs brought this suit pursuant to § 1983 on November 21, 2017, alleging violations of their First and Fourteenth Amendment rights and seeking a temporary restraining order ("TRO") to enjoin the Department of Elections from certifying the results of the HD 28 election. Because the statutory deadline for certifying the election results was fast-approaching, plaintiffs sought a prompt hearing on the request for a TRO. Following full argument on the merits, the Court denied the motion for a TRO, noting that, for the reasons stated by the Court in the course of the hearing, plaintiffs had not met the requirements for the issuance of a TRO as set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Specifically, the plaintiffs had not made a clear showing of likelihood of success on the merits. Nor did the record reflect that the plaintiffs would suffer immediate irreparable harm as there was a potential state remedy for any inadvertent error in the distribution of ballots. And the balance of equities and public interest weighed in favor of allowing certification to proceed.[7] Accordingly, on November 22, 2017, an Order issued denying plaintiff's motion for a TRO. *See Lecky v. Va. State Bd. of Elections*, 1:17-cv-1336, at *1 (E.D. Va. Nov. 22, 2017) (Order). Thereafter, pursuant to Virginia Code § 24.2-679, the State Board of Elections certified the results of HD 28

---

[7] In the hearing, the Court emphasized that principles of separation of powers and federalism establish a preference that where, as here, state or local election irregularities occur, those irregularities should be addressed in the first instance through state mechanisms—in this case, contest proceedings in the General Assembly. That is not to say that federal courts should never interfere in state or local elections, but these principles suggest that states should be afforded the first opportunity to remedy errors in their own elections.

for the 2017 general election with Thomas receiving 11,842 votes and Cole receiving 11,760 votes—a margin of victory of 82 votes. A later recount, requested by losing candidate Cole, confirmed Thomas as the winner of the election, but reduced the margin of victory to 73 votes. Cole did not give written notice of his intent to contest the election within three days of the conclusion of the recount, and, as such, these election results are now final.[8]

Because the only remedy plaintiffs sought in the original complaint was an injunction prohibiting the Department of Elections from certifying the election results, an Order issued on November 29, 2017, directing plaintiffs to show cause why the complaint should not be dismissed as moot. *See Lecky v. Va. State Bd. of Elections*, 1:17-cv-1336, at *1 (E.D. Va. Nov. 29, 2017) (Order). On December 6, 2017, plaintiffs filed an amended complaint and the motion for a preliminary injunction at issue here. The amended complaint alleges that the errors in house district assignments were the result of "[d]efendants employing inadequate safeguards, including allocating insufficient resources, against erroneous depravations [sic] of the right to vote." Am. Compl. ¶ 33. The amended complaint further alleges that administrators of this election knew, or had reason to know, that significant numbers of registered voters were incorrectly assigned to house districts well before the 2017 election. To support this allegation, plaintiffs attached declarations to their reply in support of the motion for a preliminary injunction which disclosed that in March 2015, the Fredericksburg Registrar's Office received a telephone call about possibility of voters being given incorrect ballots for two districts. Later, on April 22, 2016, at a meeting of the Fredericksburg Board, Chairman Rodriguez discussed the problem of incorrectly assigned voters and requested that the issue be fixed. Plaintiffs also filed a motion to file supplemental briefing on

---

[8] Although not essential or material to resolution of this preliminary injunction, it is worth noting that the Department of Elections' report revealed that 61 people mistakenly voted in HD 28, rather than HD 88, and 86 people incorrectly voted in HD 88, rather than HD 28. Given Thomas's margin of victory was 73 votes, the election results would only change if many of the voters who mistakenly voted in HD 28 voted for Thomas, and if many of the voters who mistakenly voted in HD 88 intended to vote for Cole. In any event, this calculation is irrelevant and certainly does not render moot the request for a preliminary injunction.

January 4, 2018, the night before the hearing on their motion for a preliminary injunction. Plaintiffs attached declarations to that motion which provided additional evidence of the discussion of these problems prior to 2017, namely that the Speaker of the House of Delegates complained about the incorrect assignment of voters in April 2015 and the loser of the 2015 Republican primary requested FOIA documents in March 2016 about the assignment of voters to HD 28 and 88. Finally, the supplemental briefing reveals that the Hoffman, the General Registrar of Fredericksburg, sent emails to the Department of Elections in March 2017 asking how to ensure he received the correct ballots for Fredericksburg precincts.[9]

Based on these allegations, the amended complaint asserts the following five claims: (1) denial of the right to vote in violation of substantive due process; (2) denial of the right to vote in violation of procedural due process; (3) undue burden on the right to vote in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment; (4) disparate treatment of voters in violation of the Equal Protection Clause; and (5) disparate treatment. Plaintiffs also seek a preliminary injunction ordering the State Board of Elections to vacate the certification results for HD 28, barring the Clerk of the House of Delegates from seating the winner of the HD 28 race, and ordering a new election for HD 28.[10]

## II.

The standard for the issuance of a preliminary injunction is too well-settled to require extended discussion. A party seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

---

[9] At oral argument on the motion for a preliminary injunction, counsel for Defendant Registrars argued that these events do not actually indicate that the election officials were aware in advance of the specific problems that occurred on November 7, 2017. Specifically, counsel noted that the errors addressed in 2015 and in 2016 involved voters different from the voters affected in the 2017 election.

[10] On January 8, 2018, following oral argument and before an order or a memorandum opinion issued, plaintiffs noticed an appeal of the Court's oral denial of plaintiff's motion for a preliminary injunction. Merely noting an appeal, however, does not preclude issuance of this Memorandum Opinion.

7

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). With respect to likelihood of success on the merits, the Fourth Circuit has made clear that though the movant need not show a certainty of success, he must make a "clear showing" that he is likely to succeed on the merits. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Analysis of each of these factors discloses that plaintiffs have not made the required showing for a preliminary injunction.

## A.

To begin with, plaintiffs have not made the requisite clear showing of likely success on the merits. The Supreme Court has made clear that the first inquiry in any suit under § 1983 is "whether the plaintiff has been deprived of a right secured by the Constitution and laws." *Baker v. McCollan*, 443 U.S. 137, 140 (1979) (internal quotation marks omitted). In the context of state or local election irregularities, the Fourth Circuit has also made clear that "[w]hether the irregularity amounts to a constitutional claim depends on its severity, whether it was intentional or more of a negligent failure to carry out properly the state election procedures and whether it erodes the democratic process." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980)). Importantly, Fourth Circuit precedent also requires courts considering these claims to pay mind to "[t]he functional structure embodied in the Constitution, the nature of the federal court system, and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by section 1983 . . . ." *Hutchinson v. Miller*, 797 F.2d 1279, 1282 (4th Cir. 1986) (quoting *Gamza*, 619 F.2d at 452). In other words, it is important for federal courts to be exquisitely sensitive to interfering in state and local elections because, as the Supreme Court has noted, states have the

power "to regulate the elections of their own officials." *Oregon v. Mitchell*, 400 U.S. 112, 125 (1970) (opinion of Black, J.). This does not mean that federal courts should never intrude into the state electoral process, but it does underscore that federal courts should not do so absent thorough consideration of both the merits of the claims and the implications of intervention.

Plaintiffs in this case argue that they were denied the right to vote in HD 28[11] or had their votes diluted in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. With respect to plaintiff's substantive due process claims, courts in this circuit and elsewhere have uniformly distinguished between "broad-gauged," "patent and fundamental unfairness that erode the democratic process" and "garden variety election irregularities" that do not give rise to a due process claim under § 1983. *See, e.g.*, *Hutchinson*, 797 F.2d at 1283, 1287.[12] In this regard, cases justifying federal intervention have involved attacks "upon the fairness of the official terms and procedures under which the election was conducted" and have not required the federal court to "enter into the details of the administration of the election." *Griffin*, 570 F.2d at 1078. Importantly, "[m]ere fraud or mistake will not render an election invalid." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) (holding that the Hawaii Supreme Court's *ex post* clarification of state law to count 45,000 blank ballots as cast ballots amounted to "a garden variety election irregularity," and not a substantive due process violation).

---

[11] As an initial matter, it is not clear that there is a federal constitutional right to vote in a particular district. The districts are assigned by the General Assembly, and federal law appears to be agnostic on the question of which ballot a voter is given. With that said, the Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Accordingly, it is appropriate to assume that such a right exists.

[12] *See also, e.g.*, *Shannon v. Jacobowitz*, 394 F.3d 90 (2d Cir. 2005); *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978); *Hendon*, 710 F.2d at 182.

Applying these principles, courts have found that the "total abrogation of a statutorily-mandated special election,"[13] the widespread "retroactive invalidation of the absentee and shut-in ballots" cast by voters relying on official inducements,[14] the systematic lack of uniform rules, standards and procedures leading to failures in registration, a lack of sufficient voting machines, and inadequate poll worker training over the course of 30 years and several elections,[15] and the last minute consolidation of precincts resulting in hours long wait times and mass disenfranchisement,[16] all amount to the kind of "broad-gauged unfairness" that renders an election patently and fundamentally unfair.  On the other hand, the inaccurate tabulation of votes stemming from malfunctioning electronic voting devices,[17] the dilution of legal votes caused by election officials permitting non-Democrats to vote in a Democratic primary,[18] the mistaken use of the wrong district map in assigning voters,[19] the inadvertent printing of ballots that failed to comply with statutory requirements,[20] and the post-election counting of 45,000 blank ballots as "cast ballots" despite election officials' pre-election policy of not counting blank ballots,[21] have all been deemed "garden variety irregularities" insufficient to state a due process claim.  In sum, courts have clearly drawn a line between "broad-gauged unfairness" and "garden variety election irregularities," and the task here is to determine where the problems that occurred on November 7, 2017 fall.

---

[13] *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985).

[14] *Griffin*, 570 F.2d at 1070–71.

[15] *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008).

[16] *Ury v. Santee*, 303 F. Supp. 119, 126 (N.D. Ill. 1969).

[17] *Shannon*, 394 F.3d at 90; *Hennings v. Grafton*, 523 F.2d 861, 863-64 (7th Cir. 1975); *White-Battle v. Democratic Party of Virginia*, 323 F. Supp. 2d 696, 705 (E.D.Va. 2004).

[18] *Powell v. Power*, 436 F.2d 84 (2d Cir. 1970).

[19] *Harris Cty. Dep't of Educ. V. Harris Cty., Tex.*, 2012 WL 3886427 at *7 (S.D. Tex. Sept. 6, 2012).

[20] *Hendon*, 710 F.2d at 182.

[21] *Bennett,* 140 F.3d at 1221-23.

Plaintiffs have not made the requisite clear showing that the assignment of voters to the incorrect house districts and the distribution of ballots associated with those incorrect house districts amount to the kind of broad gauged unfairness necessary to state a due process claim. Rather, as in *Shannon, Hennings*, *Powell*, *Harris*, and *Hendon*, the allegations in the amended complaint attribute these election irregularities largely to innocent human or mechanical error in entering the addresses assigned to each precinct, and at most, negligence on the part of election officials in failing to correct those errors.

Plaintiffs rely on *Griffin*, *Ury*, and *Krieger*[22] to argue that this case involves broad gauged unfairness but their reliance on these cases is misplaced as they are distinguishable from the facts presented here. In *Griffin*, election officials advertised and issued absentee ballots for use in a Democratic primary. 570 F.2d at 1067. After the primary, the losing candidate contested the validity of the absentee ballots, and the Rhode Island Supreme Court ultimately invalidated the absentee ballots, finding "there is no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election." *Id.* at 1068. On these facts, the First Circuit found that this retroactive invalidation of ten percent of the ballots cast constituted "broad-gauged unfairness" because the election officials' distribution of ballots that were eventually determined to be invalid was an "officially sponsored election procedure which, in its basic aspect was flawed." *Id.* at 1076. By contrast, in this case, the amended complaint does not allege that there is any fundamentally flawed, officially sponsored election procedure; instead, this case involves clerical errors on the part of Registrar employees in assigning addresses to house districts.

---

[22] *Kreiger v. City of Peoria*, 2014 WL 4187500 (D. Ariz. Aug. 22, 2014).

Plaintiffs' reliance on *Ury* is also unpersuasive. Like *Griffin*, *Ury* involved a flawed official policy—the last minute consolidation of 32 precincts into only six precincts—which resulted in widespread and systematic election problems, including mass disenfranchisement. The *Ury* case is clearly distinguishable from the case at bar both in its cause and in its result; the problems in *Ury* were caused by an official policy by the Village Board of Trustees, not a clerical mistake by Registrar employees. Moreover, because of the consolidation of precincts in *Ury*, voters on Election Day encountered long wait times, inadequate voting facilities, traffic jams, and excessive crowding at the polling places, all of which resulted in "hundreds of voters [being] effectively deprived of their right to vote." 303 F. Supp. at 124. Indeed, the *Ury* complaint attached affidavits of 397 voters who were unable to vote at all in the election. In sum, the source and the scope of the problems in *Ury* are completely different from the clerical errors that occurred here.

*Krieger* also involved a flawed officially sponsored election policy, and as such, is unhelpful to plaintiffs' case. In *Krieger*, defendants mistakenly printed two rounds of ballots that did not include the name of one of the candidates. The *Krieger* court emphasized that the plaintiffs there were not challenging the election officials' mistake in printing the wrong ballots because the misprinted ballots "were unintended irregularities." *Id.* at *5. Rather, the *Krieger* plaintiffs challenged "the official action taken by Defendants to remedy those errors," namely the election officials' policy that votes cast on the misprinted ballots would be counted, despite the fact that the misprinted ballots omitted one candidate's name. *Id.* Here, by contrast, plaintiffs are challenging the Registrar employees' mistake in assigning 86 HD 28 voters to HD 88, not an official policy developed by election officials to preclude certain or any HD 28 voters from voting in HD 28.

To the extent plaintiffs do challenge the election officials' response to the irregularities, namely the Fredericksburg Board Members' failure to provide provisional ballots to some voters, this challenge falls short of establishing a substantive due process violation. To begin with, it is not at all clear that the officials' actions violated Virginia law. The Virginia Code provides that "[w]hen a person offers to vote . . . and the general registrar is not available or cannot state that the person is registered to vote, then such person shall be allowed to vote by paper ballot . . . ." Va. Code § 24.2-653. The plain text of the Code clearly contemplates the distribution of provisional ballots to voters who claim to be registered to vote, but whose names do not appear in the VERIS registration lists. The Code does not refer to situations where, as here, voters appear in the database assigned to one district, but claim to be registered in another district. In other words, there is no authority in the Code that requires the issuance of provisional ballots based on district assignment errors in the VERIS street file. Moreover, the Fredericksburg officials' decision not to provide provisional ballots was reasonable given the circumstances. The officials could not have allowed the voters to cast a ballot in HD 88 and to fill out a provisional ballot in HD 28 because it would be impossible to track and remove the HD 88 votes if investigation determined the voter was actually assigned to HD 28. Weighing these options, the officials made the reasonable decision to presume the validity of the statewide database and to allow the voters to cast actual, not provisional, ballots in HD 88.

Even assuming, *arguendo*, the election officials' failure to provide provisional ballots was a violation of Virginia law, this violation would still not rise to the level of a due process violation. In *Hendon*, plaintiffs there brought equal protection and due process claims alleging that their right to vote was violated when the ballots in the general election failed to comply with technical requirements of a North Carolina statute. Although the Fourth Circuit in *Hendon*

acknowledged "the failure of the ballots to comply fully with statutory requirements," the court found that failure "does not constitute a violation of the due process clause" because "[t]here is no indication that the failure was other than simple negligence on the part of election officials." 710 F.2d at 182. As in *Hendon*, even assuming the failure of election officials to provide provisional ballots amounted to a violation of Virginia law, plaintiffs have provided no indication that the failure was other than simple negligence on the part of the Fredericksburg officials. In sum, because the allegations suggest the errors here were no more than garden variety irregularities, plaintiffs have not made the requisite "clear showing" of a likelihood of success on their substantive due process claim. *Pashby*, 709 F.3d at 320.

Plaintiffs' procedural due process argument similarly fails. Put simply, plaintiffs have failed to make a clear showing that mistakes in the administration of an election can give rise to a procedural due process claim. For example, in *League of Women Voters of Ohio v. Brunner*, the Sixth Circuit considered a similar procedural due process claim, namely that flawed election procedures deprived voters of "their liberty interest in voting" without "adequate pre- or post-deprivation process." *Brunner*, 548 F.3d at 379. The *Brunner* court recognized that even though the voting system in that case "impinge[d] on the fundamental right to vote," the system did not implicate procedural due process and plaintiffs failed to allege a constitutionally protected interest. *Id.* Plaintiffs here point to no authority actually supporting the existence of a procedural due process claim in this context of election irregularities. Indeed, the only voting cases plaintiffs cite in this section of their brief—*Bush v. Gore*[23] and *Hunter v. Hamilton Cty. Bd. of Elections*[24]—both involved substantive due process and equal protection claims, not

---

[23] 531 U.S. 98, 105 (2000) (per curiam).

[24] 635 F.3d 219, 223 (6th Cir. 2011).

procedural due process claims. Accordingly, plaintiffs have not made the requisite clear showing that they are likely to succeed on the merits of their procedural due process claim.

Finally, plaintiffs have failed to make a clear showing of a likelihood of success on the merits with respect to their equal protection claims. Plaintiffs first argue that the *Anderson/Burdick* balancing test[25] applies and that under that framework, any interest Virginia might have in differentiating between residents of HD 28 does not outweigh the severe deprivation associated with a denial of the right to vote. But it is not clear that the *Anderson/Burdick* line of cases applies here. In *Anderson*, *Burdick*, and their progeny, courts have considered the constitutionality of state statutes, regulations, or policies that burden the right to vote, not accidental mistakes on the part of election officials in administering an election. *See, e.g.*, *Burdick*, 504 U.S. at 433 (applying balancing test to "voting regulation").[26] To hold otherwise would effectively transform any inadvertent error in the administration of state and local elections into a federal equal protection violation.

Plaintiffs here do not allege that the incorrect assignment of voters was the result of a state policy, regulation, or statute; instead plaintiffs identify a series of mistakes and corresponding failures to take corrective action. The only policy plaintiffs identify is the local

---

[25] The *Anderson/Burdick* balancing test, derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), provides that:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

[26] *See also, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 181 (2008) (assessing the constitutionality of "an Indiana statute requiring citizens to present photo identification issued by the government"); *Anderson*, 460 U.S. at 782-83 (challenging an Ohio statute requiring an Independent Presidential candidate to file a statement of candidacy). Plaintiffs cite *N.E. Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) for the proposition that *Anderson/Burdick* applies even where there is no state decision or action taken. But that case also involved a state decision or policy, namely the state's automatic disqualification rule for wrong precinct ballots.

15

election officials' decision not to provide provisional ballots to voters who identified themselves as assigned to the incorrect district on Election Day, allegedly in violation of Virginia law. As mentioned above, it is not clear that the failure to provide provisional ballots constituted a violation of Virginia law; indeed, the plain text of the statute does not contemplate the situation at issue here. *See supra* p. 11. And, as in the substantive due process context, even assuming the Fredericksburg officials' failure to provide provisional ballots amounted to a violation of state law, it would not rise to the level of an equal protection violation. The Seventh Circuit, in *Hennings*, considered a similar claim based on the failure of election officials to provide substitute paper ballots when voting machines malfunctioned in violation of state law. The *Hennings* court concluded that these errors did not give rise to an equal protection claim because "[m]ere violation of a state statute by an election official . . . will not give rise to a constitutional claim and an action under Section 1983." *Hennings*, 523 F.2d at 864 (quoting *Snowden v. Hughes*, 321 U.S. 1, 11 (1944)). Accordingly, plaintiffs have not succeeded in establishing that the *Anderson/Burdick* framework of analysis applies here.

Next, plaintiffs argue that the election officials violated the Equal Protection Clause by providing some HD 28 voters with the correct ballots and others with the incorrect ballots. In this respect, the Supreme Court has noted that generally "[u]neven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'" *Snowden*, 321 U.S. at 8.[27] And in the voting context, the Supreme Court has recently recognized that "arbitrary" treatment of voters, in some circumstances, can also result in equal protection violations, even where it is not intentionally discriminatory. *See*

---

[27] *See also Gamza*, 619 F.2d at 453 (noting that there is a "distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote."); *Powell*, 436 F.2d at 88 ("Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'").

*Bush*, 531 U.S. at 104–05 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). But neither intentional discrimination nor arbitrary distinctions have been shown to exist here.

To begin with, as mentioned before, the amended complaint contains no allegations suggesting any invidious or intentionally discriminatory behavior on the part of the election officials. At most, the amended complaint discloses negligence on the part of Registrar employees in entering information and negligence on the part of election officials in failing to correct the mistakes once they became aware of those mistakes. In *Gamza*, an error in setting up matrices on voting machines meant that many votes for one candidate were erroneously assigned to a different candidate. The Fifth Circuit concluded that the error did not constitute a denial of equal protection of the laws because "there [was] no evidence that the initial error in setting up the matrices and the subsequent miscount of the ballots resulted from anything but entirely innocent human error." *Gamza*, 619 F.2d at 452-54. Similarly here, the allegations suggest these irregularities were the result of "innocent human error," and not invidious discriminatory behavior.

Nor have plaintiffs made a clear showing that the election officials subjected voters to "arbitrary" distinctions. Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters. For example, in *Bush v. Gore*, the Supreme Court found that "[t]he recount mechanisms implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" because of the "absence of specific standards to ensure [the recount procedure's] equal application." 531 U.S. at 105-06. Similarly, the Sixth Circuit in *Brunner* found the facts in the

complaint adequately alleged an equal protection violation because the "non-uniform standards, processes, and rules" for elections in Ohio had resulted in mass disenfranchisement and unreasonable dilution of the vote depending on a voter's residence. 548 F.3d at 466.

By contrast, the amended complaint here does not allege that a lack of uniform or specific standards or procedures contributed to the erroneous assignment of voters to house districts. Instead, the complaint suggests that the election irregularities resulted from mere human error in failing to assign addresses to the right location and negligence in failing to correct the errors once election officials learned of the possibility of incorrect assignments. Plaintiffs do not argue that the procedures for assigning localities are not uniform or that voters were treated differently once they informed poll workers that they believed themselves to be assigned to a different district. Accordingly, it is not clear that plaintiffs are likely to succeed on their claim that state officials imposed distinctions so arbitrary as to amount to an equal protection violation.

**B.**

With respect to irreparable harm, plaintiffs essentially contend that any deprivation of a constitutional right automatically constitutes irreparable harm. But this contention ignores an important of part of the analysis courts must conduct in considering whether to grant a preliminary injunction, namely whether the party "is likely to suffer irreparable harm *in the absence of preliminary relief.*" *Di Biase*, 872 F.3d at 230 (quoting *Winter*, 555 U.S. at 20). In this case, assuming these plaintiffs were denied the right to vote in HD 28 in the November 7 election, that irreparable harm has already occurred. The important question is thus whether additional irreparable harm will occur if the Clerk of the House of Delegates is permitted to seat Thomas as the winner of HD 28. In their reply in support of their motion for a preliminary injunction, plaintiffs suggest that important House of Delegates business takes place in the first

month of a session, namely the Speaker is chosen and committee assignments are selected. Plaintiffs allege that this process affects many of the bills that will be considered in the session and how votes occur, all of which are effects that cannot later be repaired. Even assuming the seating of a single member can have the effect plaintiffs claim, this factor does not weigh decisively in favor of an injunction at this time because Thomas can be removed from office if a new election is ordered and if Cole ultimately prevails. And even if this single factor weighs in favor of plaintiffs, plaintiffs' failure to make a clear showing of likelihood of success on the merits nonetheless ends the matter.

## C.

Finally, the balance of hardships and the public interest do not weigh in favor of an injunction at this time and on this record. To be sure, "right of suffrage is a fundamental matter,"[28] but the Fourth Circuit has emphasized the importance of considering in these cases "[t]he functional structure embodied in the Constitution, the nature of the federal court system, and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by section 1983 . . . ." *Hutchinson*, 797 F.2d at 1282 (quoting *Gamza*, 619 F.2d at 452). In this case, the structure of the Constitution and the nature of the federal court system weigh against the issuance of a preliminary injunction. As the Fourth Circuit recognized in *Hutchinson*, "[t]he Constitution anticipates that the electoral process is to be largely controlled by the states and reviewed by the legislature." *Id.* at 1283. And "states undoubtedly retain primary authority 'to regulate the elections of their own officials.'" *Id.* (citing *Oregon*, 400 U.S. at 125). Virginia here has done its job of ensuring due process by providing numerous avenues by which to challenge election results, including recounts and election contests. Intervention of a federal

---

[28] *Reynolds v. Sims*, 377 U.S. at 555.

court into the details of this election, on this record, would "be inconsistent with proper respect for the role of others whose job it is to canvass the returns and declare a prevailing party." *Id.* at 1286. Moreover, were an injunction granted in this case, it might also provide incentives for candidates and voters to ignore the principal routes established to challenge an election. In sum, it is far from clear on this record that the balance of hardships and the public interest favor plaintiffs. And, in any event, even assuming that the balance of hardships and the public interest support a preliminary injunction, the absence of a clear showing of likelihood of success on the merits means plaintiffs have not made the required showing for a preliminary injunction at this time.

### III.

In sum, plaintiffs in this case have not made a clear showing that they are likely to succeed on the merits of their claim, nor have they established that the balance of hardships and the public interest favor an injunction. For these reasons and because, as the Supreme Court has noted, "federal voiding of a state election" is a "drastic, if not staggering,"[29] remedy, the motion for a preliminary injunction must be denied.

An appropriate Order will issue.

Alexandria, Virginia
January 11, 2018

/s/
T. S. Ellis, III
United States District Judge

---

[29] *Bell v. Southwell*, 376 F.2d 659, 662 (1967).